LOUIS FASSOLA, Plaintiff-Appellee, *v.* MONTGOMERY WARD INSURANCE COMPANY, Defendant-Appellant.

Third District    No. 81-496

Opinion filed March 16, 1982.

Howard T. Brinton and Marcia B. Orr, both of Wildman, Harrold, Allen & Dixon, of Chicago, for appellant.

Roger D. Rickmon and Douglas L. Ziech, both of Murphy, Timm, Lennon, Spesia & Ayers, of Joliet, for appellee.

JUSTICE ALLOY delivered the opinion of the court:

This is an appeal by defendant insurer Montgomery Ward Insurance Company (hereinafter Insurer) from a judgment entered against it in a small claims action arising out of its automobile insurance policy issued to plaintiff Louis Fassola. Insurer raises an issue with respect to the Department of Insurance Regulations, specifically on the proper method for valuation of older automobiles (those no longer listed in regularly used valuation source books) when it is determined that there is a total loss. The Insurer contends that the trial court erred in concluding that their method of valuation was improper. It also raises an issue as to the correctness of the court's award of costs and attorney fees to plaintiff Fassola, based upon a finding of vexatious delay on the part of the Insurer. Ill. Rev. Stat. 1979, ch. 73, par. 767.

The facts in the record indicate that on October 15, 1980, plaintiff Louis Fassola, driving his 1973 Dodge Dart, was struck by a car driven by Kim Hrusosky. Both Fassola and Hrusosky were insured by Montgomery Ward Insurance Company. Fassola was covered under a family car policy which was in effect at the time of the accident. Fassola testified at trial

concerning the condition of his automobile prior to the accident. He testified that his Dodge Dart was very reliable and that he drove it to work everyday. He stated that he had regular twice-a-year tuneups for it and had recently had a new water pump installed in it. It started regularly in the winter and required little, other than regular maintenance. It fully satisfied his work-related transportation needs. Fassola also indicated that prior to the accident the car had a crease in the left door, which did not hinder its functioning, nor allow weather in. The car also had some rust spots on the body. The record is clear that his 1973 Dodge Dart provided him with reliable and economical transportation and that he valued it for those reasons, not for its appearance.

In the accident, Fassola's Dodge Dart sustained considerable front end damage, including damage to the grille, radiator, fan, headlights, and front fenders. Insurance Adjuster John Ouradnik, who examined the damaged vehicle on behalf of the Insurer, testified that he determined that the cost for repairing the accident damage would be $771. Ouradnik also testified at trial that he conducted a market survey of the value of a '73 Dodge Dart and determined from it that the average value of such an auto was approximately $700. Because the car was no longer listed in the "red book" (the regularly used valuation source book), the market survey was required in this case. In describing how he undertook the survey, Mr. Ouradnik stated:

> "Market survey, contact dealers, used car lots, describe the car to them, see what they have in like kind and quality, similar to the condition of this vehicle."

Based upon the assessment of the costs of repair ($771) and the market value of the auto ($700), it was determined to be a total loss.

Illinois Department of Insurance Regulations set forth the procedure for adjusting and settling claims for total losses. Rule 9.19, §6B9 provides that an insurer must base the settlement on the "basis of actual cash value, or replacement with other of like kind and quality." Subsection (ii)(a) of Rule 9.19, §6B9, states:

> "(ii) THE COMPANY MAY SELECT A CASH SETTLEMENT
> (a) A cash settlement must be based upon the retail value of the automobile as published in a generally recognized source that is uniformly and regularly used by the company. Any deviation from this procedure must be supported by documentation that gives detailed information about the automobile's condition. Any deduction from retail valuations must be measurable, discernible, itemized and specified concerning dollar amount, and they shall be appropriate in amount.
> If the retail value of the specific automobile is not published in a generally recognized source, which is used uniformly and regularly

by the company, the company must secure at least two written retail value dealer quotations and base the settlement upon them. Any deviation from this practice must be supported by documentation giving particular information about the automobile's condition. The source of the dealer quotations must be maintained in the claim file * * *."

In the instant case, the Insurer had conducted a market survey of '73 Dodge Darts in similar condition to Mr. Fassola's and had found the retail value to be $700. However, that was not the value placed by the Insurer on Fassola's Dodge Dart. To arrive at the Insurer's "retail value" for purposes of settlement, Mr. Ouradnik took another step. From the $700 figure obtained as retail value from the market survey, he then subtracted the costs which would have had to have been incurred in order to fix the old damage, that is, the damage existing prior to the accident. He testified that this was his general procedure in arriving at market value of an older model auto prior to an accident. He then testified that to fix the crease in the door, the rust spots, and the bent bumper it would have cost $548.12. Thus, Ouradnik, using this method of valuation, determined that Mr. Fassola's reliable and well-maintained Dodge Dart was worth a mere $151.88. Subsequently, based upon this figure, Montgomery Ward offered Mr. Fassola $250 in settlement. The offer was rejected, and Mr. Fassola indicated that he would retain counsel to get a fair settlement.

Mr. Fassola's attorney then contacted the Insurer and demanded $450 plus costs. The Insurer explained how the $250 figure was arrived at by them and informed counsel for Mr. Fassola that the company's offer was firm. A letter was also written to Mr. Fassola by a company representative, one Maureen McGrath, which also explained to him the $250 offer and the procedure in arriving at that figure. We quote, in relevant part, from the letter, dated October 30, 1980:

"Upon determining your car to be a total loss *I performed a market survey* for the value of your car. *I received quotes* from three separate dealers and the average of their quotes was $700.

When our appraiser inspected your vehicle, he found that there was old damage in the amount of $548 on your car. The figures *I had obtained* in *my market survey* were for *a 1973 Dodge Dart* in average to good condition. Thus, we had to deduct the amount of old damage from our survey figure.

We are offering you $250 in full and final settlement of your collision claim. * * *." (Emphasis added.)

Thereafter, plaintiff, by his counsel, filed the instant small claims action. In the action he requested $700 damages under the contract of insurance, plus expenses for storage, and the costs and fees of the suit, based upon the Insurer's unreasonable delay in settling the claim.

Faced with the suit, the Insurer then contacted plaintiff's attorney on November 13, 1980, and was told by counsel that Mr. Fassola was adamant about receiving $450 plus the $62 storage costs. Subsequent thereto, and prior to March 4, 1981, Mr. Fassola raised his settlement demand to $750. On March 18, 1981, Fassola's attorney informed the Insurer that he believed settlement could be made for $514. The Insurer agreed to settle at that amount, but Mr. Fassola did not. He refused the offer of $514 and stated he wanted $750 or his day in court.

On May 15, 1981, Fassola's attorney contacted the Insurer to offer a settlement of $587.32. No settlement was reached. The company continued to offer $514. Mr. Fassola continued to refuse that offer. The case then went to trial, during which the above stated evidence was presented. The trial court heard it, including considerable controverted evidence with regard to the shifting settlement negotiations. The court entered judgment for $500 to cover the damage to the auto, and, in addition, it awarded plaintiff Fassola $250 in attorney fees and costs, based upon the Insurer's vexatious delay in settlement. From the damage award and the award of fees and costs the Insurer now appeals.

The first issue raised concerns the Insurer's method for valuing the Fassola auto. It argues that the court erred in finding that the company had assigned an improper total loss value for the '73 Dodge Dart. The Insurer argues that Mr. Ouradnik's method of valuation, which resulted in the car's value being put at $151.88, was the proper and correct method and in compliance with the insurance regulations which apply. We disagree completely with the Insurer and agree with the trial court.

■■ The applicable insurance regulation, specifying procedures for cash settlements in the event of a total loss, has been set forth, in relevant part, previously in this opinion. It requires the Insurer, in situations where no "red book" value is set forth because the auto is an older model, to obtain dealer quotations as to retail value and to base settlement upon those quotations. This is the so-called "market survey" approach to valuation. The regulation also requires documentation of the dealer quotations and documentation of any deviation from the dealer quotations. The company argues that its method, obtaining a retail value from the market survey and then subtracting the costs for the repair of old damage, was proper under the regulation and that it accurately gave the retail value of the Fassola auto at $151.88. In support thereof, on the factual level, they assert that Mr. Ouradnik's valuation arrived at from the market survey, being $700, was based upon a '73 Dodge Dart without any old damage. They point to Ouradnik's testimony in the record that a '73 Dodge Dart, without old damage, would be worth $700. This testimony as to the nature of the market survey is contradicted, however, by defendant Insurer's own evidence in the record. Ouradnik himself, in describing the method

he used, stated that he contacted other dealers and used car lots, described the car to them, inquired as to what they had "in like kind and quality, *similar to the condition of this vehicle*." Thus, at one point in his testimony Ouradnik states that the market survey was on a car in similar condition to plaintiff's auto, which would presumably include the old damage, while at another point in testimony he asserts that it was based upon an undamaged '73 Dodge Dart. The latter assertion, that the survey was based upon an undamaged auto, is further contradicted when Maureen McGrath's letter, already set forth, is examined. In that letter, McGrath states on two occasions that it was she who performed the market survey and that the survey was based on a '73 Dodge Dart in *average to good condition*. She does not indicate that the market survey was based on a completely undamaged Dodge Dart, as the Insurer now asserts. Rather, she states that it was based upon a Dodge Dart in average to good condition.

The facts in the record as to the condition of Mr. Fassola's '73 Dodge Dart indicate that prior to the accident it was in average to good condition for a '73 Dodge Dart. As to essential, transportation related matters, the auto was in excellent shape, according to the facts in the record. Mr. Fassola testified to his regular use of the auto and to its reliability. He saw to it that it received regular maintenance and any necessary repairs. In short, it was a reliable work-car. The record does indicate that the auto had some relatively minor body damage (rust spots and dents), but the evidence indicates that none of the pre-accident damage affected or impaired the auto's essential functioning. Even considering as significant the cosmetic problems, this '73 Dodge Dart was in average to good condition for a '73 Dodge Dart. Some deterioration, especially with respect to the body, is the rule rather than the exception with older model automobiles.

■■ It can be seen from a review of the record that the Insurer's own evidence, found in Ouradnik's testimony and in McGrath's letter, contradicts the claim that the market survey was based upon an auto "without old damage," as Ouradnik later would claim. The record supports a conclusion that the Insurer's market survey was based upon quotations obtained on a '73 Dodge Dart, in average to good condition, similar to that of Fassola's '73 Dodge Dart. Under the circumstances, having obtained a retail value ($700) from the market survey, it was completely improper for the Insurer to then reduce that amount by an amount equal to the amount it would have cost to repair the old body damage. In effect, as it had to know, the Insurer was reducing the value of the auto twice, once implicitly through the market survey and then again with the subtraction of repair costs. In addition, we find support in the record for the trial court's conclusion that the Insurer deliberately used this improper and erroneous standard of measuring retail value.

Some further comment is necessary on the proper method for valuation of total losses, where the subject auto is not listed in a generally recognized source. The inequity of the Insurer's market survey approach herein is amply demonstrated by the facts. Fassola had an older model auto which was well maintained and which was providing reliable transportation for him. In its essential functioning, it was in excellent shape. In its nonessential aspects, that is its cosmetic appearance, it had the type of damage which might be expected on an older model auto. It had some scrapes, dents and some rust spots. The market value of such older models is not primarily based upon their cosmetic appearance. Such autos are valued, as was this Dart by Mr. Fassola, for their reliability and low cost maintenance. Quite obviously in this case, Mr. Fassola did not care about the minor body damage, nor was he contemplating having it repaired. Yet, the Insurer herein, through use of its market survey approach, found the retail value of Fassola's reliable 1973 Dodge Dart to be $151!

■■ As was noted by the court in *Crandall v. Country Mutual Insurance Co.* (1980), 81 Ill. App. 3d 140, 143, 400 N.E.2d 1100, where a value is to be found in a recognized source book (NADA book price, *e.g.*), the value there found represents a base, or starting, value for an average automobile. The same is true when the market survey approach, utilizing dealer quotations, is used. Dealer quotations on older model automobiles will usually be based on comparable older models in average condition, *i.e.*, average condition for an older model. And, as already noted, average condition for an older model auto is often with a few dents and some rust. We can take judicial notice of the fact that the passage of time inevitably leaves its mark upon all physical objects, and that rust and minor dents are frequently the marks of time on older autos. If anyone knows this truth, it is the dealer in used cars. Dealers also know that most older model autos are valued for their reliability, not their appearance. Thus, absent direct evidence in the *written dealer quotations* that an estimate is based upon a completely undamaged, rust-free model, it will be presumed that such estimates are based upon a similar model in average condition for such older automobiles. Unless the insured's auto is completely undamaged, the Insurer ought to specify the pre-accident condition of the auto (both its pros and cons), so that the dealer may note how, if at all, such existing condition affects his estimate. In this way, deviations from the average value will be documented by the persons supplying the valuation figure, not by the Insurer.

Such an approach is based upon the practicalities and realities of the market in older model automobiles. It will prevent insurers from obtaining vague and questionably based market valuations from dealers and then subtracting the cost to repair existing damage which had little, or no effect upon the market valuation. The absurdity of the Insurer's approach

can be seen if one posits further existing dents in Mr. Fassola's Dart's passenger-side door and in the trunk hood. The Insurer's actual evidence indicated that the cost to repair old damage (rust, crease in door, and bent bumper) would have been $548. If we would add the cost of the hypothetical damage to the other door and the trunk hood, there is little doubt that the total to repair all existing damage would have been in excess of $700, that is, in excess of the market value obtained by the Insurer. So that, even though all the pre-existing damage did not affect the essential functioning of the auto, and even though the auto provided reliable transportation to Mr. Fassola, under the Insurer's approach, the auto would have no value whatsoever, because the costs to repair existing body damage would exceed market value of the auto. Such an approach is unacceptable.

■■ The approach which we herein adopt is fair and based upon the realities of the situation. The market value quotations received by the Insurers from dealers must be written, as the insurance regulations require, and they must indicate what information was given to the dealer about the pre-accident condition of the comparison auto, and how such pre-accident condition affects the dealer's assessment of the retail value of the auto. Documentation is the requirement of the insurance regulations, and documentation, specific and in the record, is what is required when assessing the retail value of older model autos which are determined to be a total loss.

■■ In the instant case, the Insurer used an improper and inequitable method for determining the retail value of Mr. Fassola's Dodge Dart. We find no error in the trial court's conclusion to that effect. Nor, as noted, do we find error in the court's conclusion, based upon the record, that the Insurer deliberately used an improper method to determine market value.

■■■ We next turn to the court's finding of vexatious delay, which finding was the basis for his award of fees and costs to the plaintiff Fassola. (Ill. Rev. Stat. 1979, ch. 73, par. 767.) The question of vexatious delay is a factual one, which must be based upon an assessment of the totality of the circumstances, taken in broad focus. (*Deverman v. Country Mutual Insurance Co.* (1977), 56 Ill. App. 3d 122, 124, 371 N.E.2d 1147.) A trial court's determination on the issue will not be disturbed unless an abuse of discretion is demonstrated on the record. (56 Ill. App. 3d 122, 124.) We conclude that the trial court's finding of vexatious delay is supported in the evidence. There is evidence, already discussed, to indicate that Montgomery Ward obtained its market value based upon a Dodge Dart in similar condition to Mr. Fassola's. That was indicated by Ouradnik at one point in his testimony and by McGrath's letter to Fassola. Yet, rather than make an offer based upon that figure, the Insurer further deducted the full costs for repairing nonessential, pre-existing body damage to the auto.

The evidence supports the inference that the Insurer was intentionally and deliberately attempting to prevent Mr. Fassola, its insured, from obtaining the rightful value of his auto. The evidence supports the court's conclusion that the Insurer deliberately used the wrong standard of damages when making its initial offer. Then, it continued to stand by the improper and ludicrously low offer until it had forced Mr. Fassola to retain counsel and file suit. Only after suit was filed did the Insurer respond with a reasonable offer. Regardless of its later attempts to effect a reasonable settlement, the record in the instant case, considering the totality of the circumstances, supports a finding of vexatious delay. Based upon the facts in the record, the court did not err in assessing fees and costs against the Insurer.

The decision of the Circuit Court of Will County is affirmed in all respects.

Affirmed.

BARRY, P. J., and HEIPLE, J., concur.