NATIONAL TEA COMPANY *et al.*, Plaintiffs-Appellees, *v.* COMMERCE AND INDUSTRY INSURANCE COMPANY, Defendant-Appellant.

First District (5th Division) No. 82—2978

Opinion filed October 28, 1983.—Rehearing denied November 30, 1983.

Epton, Mullin, Segan & Druth, Ltd., of Chicago (Roger A. Bixby, Mary F. Stafford, and William G. Potratz, of counsel), for appellant.

Mayer, Brown & Platt, of Chicago (Alan N. Salpeter and Michael J. O'Rourke, of counsel), for appellee National Tea Company.

Rabens, Formusa & Glassman, Ltd., of Chicago (George C. Rabens, of counsel), for appellee Central National Bank in Chicago.

JUSTICE SULLIVAN delivered the opinion of the court:

This appeal is from a judgment for plaintiffs in an action seeking a declaration of the rights and liabilities of the parties under a fire insurance policy providing coverage for property damage and loss of rents. Defendant contends that (1) the trial court erroneously interpreted the general change endorsement of the policy; (2) the trial court erred in (a) excluding evidence of depreciation and of payments tendered by defendant, (b) striking an affirmative defense based on plaintiffs' failure to preserve and protect the property, and (c) instructing the jury with regard to the elements to be considered in determining the amount of rental loss; and (3) the trial court abused its discretion in awarding attorney fees and a penalty pursuant to section 155 of the Illinois Insurance Code (Ill. Rev. Stat. 1981, ch. 73, par. 767).

On May 20, 1978, a commercial building owned by Central National Bank, as trustee (owners) and leased to National Tea Company (National),[1] was substantially damaged by fire. The property was the subject of a policy of fire insurance issued by defendant to National and naming the owners as additional insureds. It is undisputed that the loss in question is covered by the policy; however, the parties disagree as to the extent of defendant's liability thereunder. Two policy provisions are pertinent to this question. The first, a general change endorsement providing coverage for property damage, states in relevant part:

---

[1]At the time of the fire the property was sublet to Nationwide Food & Liquor Store, not a party to this action.

"(a) This Company's liability for loss hereunder shall not exceed the smallest of the following amounts: (1) The amount of this policy applicable to the damaged or destroyed property (2) the cost to repair; (3) the replacement cost, defined as the cost to rebuild or replace, all as of the date of loss, on the same site or within five miles thereof, with new materials of like size, kind and quality (4) the actual expenditure incurred in rebuilding, repairing or replacing on the same or another site. [Hereinafter referred to as section (a).]

\* \* \*

(c) If the property damaged or destroyed \*\*\* is not repaired, rebuilt or replaced on the same or another site within a reasonable time after the loss or damage, this Company shall not be liable for more than the actual cash value (ascertained with proper deduction for depreciation) of such property. [Hereinafter referred to as section (c).]"

The second provision, relating to rental loss, states:

"It is hereby provided that if said premises or any part thereof, whether rented at the time or not, shall be rendered untenantable by fire or lightning occurring during the continuance of this policy, this Company shall thereupon become liable for the rental value of such untenantable portions. Loss to be computed from the date of fire or damage by lightning, until such time as the building could, with reasonable diligence and dispatch, be rendered again tenantable, although the period may extend beyond the termination of this policy."

Testimony established that the property was inspected by an adjuster on behalf of defendant shortly after the fire occurred. On June 7, 1978, he indicated in a memo that the "preliminary replacement cost" of the structure was $600,000 to $650,000, and that the building was an 80-to-85% loss, resulting in a possible liability of approximately $500,000. The memo also contained a "preliminary estimate" of $100,000 in rental loss. Subsequently, M. L. Ensminger & Co. (Ensminger) prepared an estimate at defendant's request, submitted August 4, 1978, which stated that the "reconstruction value" of the building was $523,291.86, and the cost of repair was $321,571.43. The document purported to be a firm offer to perform the repairs at the latter price; however, the offer was not transmitted to plaintiffs.

The owners received several estimates on the cost of repairing the building, ranging from a low of $421,275 to a high of $732,200. After several extensions of the time for filing, a proof of loss was submitted on April 3, 1979, based on the highest bid received. This proof of loss

was rejected as excessive on May 1, 1979, in a letter expressly reserving the right to assert any other rights or defenses "which may exist or later become known to exist." A partial proof of loss of rents in the amount of $45,000 was submitted by National on February 23, 1979, but similarly rejected by defendant as excessive, as was a subsequent proof of loss in the amount of $109,722.96, submitted March 13, 1980. The instant action was filed on May 17, 1979, and in its answer defendant admitted liability but denied the amount of damages alleged. Subsequently, a "sound value offer" of $239,261.33 was made, based on the estimated cost of repair received from Ensminger, $321,571.43, less defendant's calculation of depreciation. This sum was deposited with the court on April 7, 1980, without prejudice to the rights and claims of any party.

After hearing testimony with regard to the amount of loss, a jury found that the owners' damages for building loss were $500,000, and National's damages for rental loss were $100,000. In response to a special interrogatory, the jury found that 83% of the building was destroyed by the fire. On August 17, 1982, the trial court reduced the building loss verdict to $260,739.57 and the rental loss verdict to $63,133.88 to reflect adjustments previously agreed to by the parties. The trial court also assessed attorney fees in the amount of $99,139.55 and a $5,000 penalty against defendant based on a finding that its delay in settling the claims was vexatious and unreasonable. Defendant's post-trial motion was denied on December 6, 1982, and this appeal followed.

OPINION

Defendant first contends that the trial court erroneously interpreted the policy provision covering liability for property damage. As a result, it asserts, the jury was not properly instructed with regard to the measure of damages.

Throughout trial, defendant argued that the only applicable provision of the policy was section (c), since it was undisputed that the building had not been repaired or replaced. The owners, however, maintained that only section (a) was applicable, contending that it was sufficient that they intended to rebuild or repair but were prevented from doing so by defendant's rejection of their proof of loss and consequent refusal to pay any amount in excess of actual cash value.

While it appears that the trial court tended to agree with the owners' interpretation, the real problem here is not that the trial court misconstrued the policy, but that it failed to construe it. During the instruction conference, it refused the owners' instruction on dam-

ages, based on section (a), because it did not incorporate section (c). Similarly, it refused defendant's damage instruction, based on section (c), because it failed to incorporate section (a). Conforming instructions were not tendered and, as a result, although the trial court apparently intended to leave the construction of the contract to the jury by simply placing before it the relevant language without explanation, it in fact gave no instruction at all on the proper measure of damages. The court's rulings prevent us from determining the basis for the jury's verdict, as we are unable to ascertain whether the $500,000 verdict represents either the cost of repair or the cost of replacement under section (a) or actual cash value under section (c). Moreover, there is nothing in the policy provisions before us which requires interpretation by a jury. As we noted in *Sherbrooke Homes, Ltd. v. Krawczyk* (1980), 82 Ill. App. 3d 990, 992, 403 N.E.2d 622, 623-24:

"As a general rule, the interpretation, construction or legal effect of a contract is a matter to be determined by the courts as a question of law. [Citations.] This rule has been applied (1) when the contract is in writing [citation]; (2) when there is no ambiguity or uncertainty in the terms of the contract [citations]; and (3) when there is no question involving proof of the parties' construction which is dependent upon disputed extrinsic facts."

Thus, only if the contract is ambiguous and the extrinsic facts necessary to determine the parties' interpretation thereof are in controversy should the question of interpretation be left to a jury. (*Sherbrooke Homes, Ltd. v. Krawczyk*; *Nerone v. Boehler* (1976), 34 Ill. App. 3d 888, 340 N.E.2d 534.) In any event, a jury should not be asked to make even that determination without guidance from the court in the form of an instruction stating what conclusion must be reached if the jury finds certain facts to exist.

■ In the instant case, the trial court noted several times that the language was clear and that there was no conflict between the two sections of the policy relating to liability for property damage. Furthermore, its exclusion of testimony regarding the parties' interpretation of section (c) reinforces our belief that the trial court did not perceive any ambiguity in the contract and therefore should have accepted one of the proffered instructions. Ordinarily, in the absence of a necessary ruling, we would simply remand the issue to the trial court for further consideration. Here, however, we are presented with a question of law, not a question of fact, and we are not precluded from making our own determination thereon. (See, *e.g.*, *Rymer v. Kendall College* (1978), 64 Ill. App. 3d 355, 380 N.E.2d 1089.) It is ap-

propriate to do so in the instant action because defendant did not contest the court's failure to give *any* instruction on this issue; rather, it alleged error only in the failure to give its proffered instruction. Therefore, reversal is not required unless we determine that the trial court should have accepted that instruction, for there is no error in failure to give an incorrect instruction. *Kinka v. Harley-Davidson Motor Co.* (1976), 36 Ill. App. 3d 752, 344 N.E.2d 655.

■ We agree with the trial court that the language of the policy is clear and unambiguous. It provides that if the property is not repaired or replaced within a reasonable time, defendant's liability thereunder is limited to actual case value with appropriate deductions for depreciation. It is undisputed that the building in question has not been repaired or replaced, and we see nothing in the language which indicates that it is sufficient that the owners intended to repair or replace the structure; therefore, defendant's instruction was proper and should have been given. Our interpretation is in accord with the ruling in *Lerer Realty Corp. v. MFB Mutual Insurance Co.* (5th Cir. 1973), 474 F.2d 410, wherein the court, confronted with a policy provision identical to the one in question here, noted that its language "discloses a clear and unambiguous undertaking to pay the insured the actual cash value of the damaged property at the time of loss, less depreciation, unless the insured actually repaired, rebuilt or replaced within a reasonable time. If restoration is made, then, and only then, the liability of [defendant] would be calculated under the endorsement." (474 F.2d 410, 413.) Thus, repair or replacement is a condition precedent to recovery under this policy of any amount in excess of actual cash value.

The owners argue, however, that defendant's proffered instruction, which simply states that "[t]he policy provides that building damage shall be determined on the basis of actual cash value if the building is not replaced or repaired within a reasonable time," is improper because it fails to state that compliance with this condition may be excused if defendant's conduct has rendered performance impossible. They assert that defendant's actions were deliberately calculated to evade payment of the higher cost of repair or replacement by offering only the actual cash value in settlement when it knew the owners intended to repair or replace the building, thus precluding any possibility of repairing, rebuilding, or replacing.

Our courts have held in actions involving other types of contracts, particularly those for the sale of real estate (*Yale Development Co. v. Oak Park Trust & Savings Bank* (1975), 26 Ill. App. 3d 1015, 325 N.E.2d 418), and for payment of a salesman's commissions (*Barrows*

*v. Maco, Inc.* (1981), 94 Ill. App. 3d 959, 419 N.E.2d 634), that a party to a contract may not avail itself of a condition precedent where by its own conduct it has rendered compliance therewith impossible. We have never considered the applicability of this principle to a condition precedent in a fire insurance policy; however, in *Zaitchick v. American Motorist Insurance Co.* (S.D.N.Y. 1982), 554 F. Supp. 209, the court, after considering impossibility of compliance with an express condition precedent, held that under the circumstances before it equitable principles mandated that compliance be excused, and the insureds therefore were entitled to recover the cost of repair or replacement although they had not in fact repaired or replaced. There, the insurer denied all liability, claiming that the insureds' residence was destroyed by arson. The insureds brought suit, and the trial court found that there was insufficient evidence of arson or of any fault on the part of the insureds in regard to the destruction of their home and its contents. On the issue of damages, the insurer then argued that because the building had not been repaired or replaced, it was liable only for actual cash value under a policy providing that the insureds could not recover the cost of repair or replacement "unless and until repair or replacement [was] completed." The trial court noted that because the insurer had denied all liability, the insureds had received nothing on their loss, and that because of their age and limited income, and the nature of the property (residential rather than commercial), outside financing for repair or replacement was not a realistic alternative. The court then found that the insurer, by denying all liability and not providing even actual cash value, had prevented compliance with the condition precedent and, under the circumstances, it was therefore precluded from relying on that condition to prevent recovery of the cost of repair or replacement.

We need not decide here whether we agree with the reasoning of the court in *Zaitchick*. The owners never tendered a proper instruction on this issue, insisting instead that the trial court rule as a matter of law on what is essentially a question of fact, and instruct the jury that they were entitled to recover the cost of repair or replacement. Furthermore, if such an instruction had been offered, it should have been rejected under the facts presented at this trial, even accepting the *Zaitchick* reasoning, and defendant's instruction was therefore proper. Initially, we note that there is an important difference between the policy in the instant action and the one before the court in *Zaitchick*. That policy specifically provided that the insureds had the option of accepting actual cash value without prejudice to their right to seek recovery of the cost of repair or replacement

within 180 days thereafter, in effect insuring that at least a portion of the funds necessary to repair or replace would be financed by the insurer rather than forcing the insureds to rely totally on their own resources or the unlikely prospect of other financing. It was the exercise of this option which the court found had been frustrated by the insurer's conduct in denying all liability. The court did not find that the insurer should have provided the full cost of repair or replacement initially; rather, it believed that the insureds should have been allowed to exercise their option to receive actual cash value and partially finance replacement. Here, the policy contains no such provision, and we are not confronted with a contract between an insurer and an individual homeowner, but a multimillion dollar blanket policy entered into between defendant and National and covering numerous buildings. The parties could have included an option such as that in *Zaitchick* if they wished to insure that the owners would receive at least a portion of the necessary funding from defendant. In the absence of such a provision, we would hesitate to impose upon defendant a duty to partially fund repair or replacement under the facts of this case. (*Cf. Felbinger & Co. v. Traiforos* (1979), 76 Ill. App. 3d 725, 394 N.E.2d 1283 (doctrine of impossibility of performance does not apply where event causing the impossibility can be foreseen and guarded against in the contract).) Moreover, we note that the uncontroverted testimony at trial established that under the terms of the lease between the owners and National, it was National that had the responsibility to repair or replace the structure if it was damaged by fire.[2] Unlike the situation in *Zaitchick*, there was simply no competent evidence that National had no other source for the necessary funds and therefore was unable to comply with the condition precedent of this policy.

Since we believe that retrial of the building loss issue is necessary, we need address only such further issues related thereto which might arise in a new trial.[3] In this regard, defendant contends that the trial

---

[2]National points out that under the terms of the lease, it is in fact the owners who must repair or replace, contrary to the testimony of a representative of the owners at trial. However, that lease was not admitted into evidence, and we are concerned here only with what instruction the evidence before the court would have supported.

[3]Defendant suggests that we enter judgment *n.o.v.* for it in the amount of admitted liability. However, the basis for that figure is still a matter of controversy to be tried by a jury. While we do not know the jury's rationale in arriving at its verdict in the former trial, it appears to have found defendant's figure, based on the Ensminger proposal, too low. We do not know what a properly instructed jury would find based on the evidence contained in this record.

court erred in excluding evidence of depreciation. While we find no error in some of the rulings challenged by defendant,[4] we do not wish to restrict unduly the trial court's discretion in ruling on the admissibility of evidence upon retrial of this matter. Therefore, we will state merely that, given our determination that the policy provides only for the payment of actual cash value, evidence of depreciation is material, and testimony relevant thereto and otherwise admissible should be received.

■ Defendant further contends that the trial court erred in striking its affirmative defense that the owners failed to preserve and maintain the damaged building after the fire. We note initially that defendant was not prejudiced by the trial court's ruling, since it was permitted to elicit extensive evidence on this issue, and the jury was instructed both that the owners had the burden of proving that the damages alleged were the result of the fire and that defendant was not liable for any damages caused by the owners' neglect in preserving and protecting the property after the fire. Therefore, any error below would not require reversal on appeal (*Svenson v. Miller Builders, Inc.* (1979), 74 Ill. App. 3d 75, 392 N.E.2d 628), and defendant's arguments thereon had no part in our decision to reverse and remand for a new trial. Moreover, it is our view that the trial court's decision actually helped defendant, since the entire burden of persuasion was placed on the owners. Assertion of the affirmative defense in question could only have served to confuse the jury because it would have been necessary to instruct it that defendant had the burden of proving that some of the damage was caused by the owners' neglect (see, *e.g., Capitol Plumbing & Heating Supply, Inc. v. Van's Plumbing & Heating* (1978), 58 Ill. App. 3d 173, 373 N.E.2d 1089 (party asserting affirmative defense has burden of proof on that issue)), while simultaneously instructing it that the owners had the burden of proving that all of the damage was caused by the fire.

Nevertheless, the question now is not whether the trial court committed reversible error, nor is it our function to pass on the wisdom of a party's choice of strategy; rather, we must determine whether the defense may be raised on retrial. In this regard, we must agree that defendant's affirmative defense is not barred by waiver or estoppel, as the owners contend.

■ Waiver has been defined as "either an express or implied vol-

---

[4]For example, defendant attempted to present testimony with regard to the parties' interpretation of the contract; since the contract is unambiguous, such testimony was properly excluded.

untary and intentional relinquishment of a known and existing right."
(*Ames v. Crown Life Insurance Co. of Toronto, Canada* (1980), 85 Ill.
App. 3d 203, 204, 406 N.E.2d 222, 224.) Thus, "[t]o constitute a
waiver, the words or conduct of an insurer must be inconsistent with
the intention to rely on the requirements of the policy." (85 Ill. App.
3d 203, 204-05, 406 N.E.2d 222, 224.) The owners maintain that be-
cause defendant did not specify failure to preserve and protect the
premises after the fire as grounds for rejecting the proof of loss, it
has waived that defense. In effect, they argue that waiver may be im-
plied from defendant's conduct; however, where waiver is implied
from conduct, the act relied upon must be clear, unequivocal and deci-
sive. (*Kane v. American National Bank & Trust Co.* (1974), 21 Ill.
App. 3d 1046, 316 N.E.2d 177.) Here, it is impossible to imply waiver
from the letter rejecting the proof of loss as excessive, since defend-
ant expressly stated therein that the letter was not intended as a
waiver and that it reserved the right to assert any other rights or de-
fenses "which may exist or later become known to exist." Further-
more, defendant's rejection of the proof of loss as excessive is not in-
consistent with the defense that some of the damage was caused by
the owners' neglect; a proof of loss would be deemed excessive if the
owners were attempting to recover for damages not caused by the
fire.

Unlike waiver, estoppel does not focus on the conduct or the in-
tent of the insurer, but on the effect of its conduct on the insured. As
we noted in *National Discount Shoes, Inc. v. Royal Globe Insurance
Co.* (1981), 99 Ill. App. 3d 54, 59, 424 N.E.2d 1166, 1170:

> "Estoppel refers to an abatement, raised by law, of rights
> and privileges of the insurer where it would be inequitable to
> permit their assertion; such relinquishment need not be volun-
> tary, intended or desired by the insurer, but it necessarily re-
> quires some prejudicial reliance of the insured upon some act,
> conduct or non-action of the insurer."

Thus, the owners must show that they relied to their detriment upon
defendant's failure to assert this defense in its letter rejecting their
proof of loss. (*Tibbs v. Great Central Insurance Co.* (1978), 57 Ill.
App. 3d 866, 373 N.E.2d 492.) At trial, the owners did not assert any
detriment other than surprise when the defense was raised only five
days before trial. Similarly, in their brief before this court, they state
merely that they were "lulled *** into a sense of security with regard
to the issues to be anticipated in this action." If the only detriment
asserted is insufficient time to prepare to meet the defense, the own-
ers could have requested a continuance; moreover, the question here

is whether the defense may be asserted upon retrial. Since the owners are now fully aware of this defense and defendant's position thereon, there will be no surprise.

■ The record before us simply does not reveal any other detrimental reliance by the owners. They had been aware since the occurrence that, under the contract, defendant would not be liable for any damages caused by their neglect, and that they were required to prove the damages claimed were the result of the fire. Moreover, the owners do not claim here, nor did they before the trial court, that no steps were taken by them to preserve the property in reliance on defendant's failure to assert that defense; in fact, they have always maintained that no such neglect occurred. Any suggestion that the owners' conduct in preserving the property was in any way related to the rejection letter is further negated by the fact that the structure had already become the subject of a court-ordered demolition months before the proof of loss was filed, and demolition actually occurred within the month after receipt of that letter. Any conduct of the owners with regard to preservation of the premises must necessarily have occurred long before defendant rejected the proof of loss. For these reasons, we believe that the owners have failed to show any detrimental reliance on their part, and defendant therefore is not estopped from asserting this defense upon retrial.

Turning to the jury's verdict for National in the amount of $100,000 for loss of rents, we note defendant's assertion that the jury was improperly instructed with regard to the elements to be considered in determining a reasonable length of time within which the building could have been rendered tenantable. It does not argue that the jury should not have been instructed on the factors it could consider in assessing damages; rather, it contends first, that the instruction given was not "impartial and free from argument" as required by Supreme Court Rule 239 (87 Ill. 2d R. 239) whenever a non-IPI instruction is given, and second, that inclusion of the time for fixturing work necessary prior to reopening the store as a factor which might be considered by the jury was erroneous as a matter of law.

■ With regard to defendant's first contention, it has been held that instructions are argumentative where they constitute "adversarial statements highlighting favorable and unfavorable evidence with partisan overtones." (*Lay v. Knapp* (1981), 93 Ill. App. 3d 855, 858-59, 417 N.E.2d 1099, 1101-02.) Defendant maintains that the instruction in question improperly highlighted and emphasized the testimony of an expert witness for National who testified that he considered each of the elements set forth in the instruction in arriving at an esti-

mate of 23 to 24 months as the reasonable length of time necessary to render the building tenantable. While the witness in question did testify to each of the factors set forth, it appears also that an expert witness for defendant, when specifically questioned on cross-examination with regard to all but one of the elements set forth in the instruction, stated that he too had considered each of them in arriving at his estimate of seven months to render the building tenantable. Since experts for both sides agreed on all but one of the factors, we do not believe that the instruction in question was partisan in tone or highlighted one witness' testimony. In any event, since defendant's own witness considered all but one of the elements, it is our view that defendant was not prejudiced by the instruction.

With regard to the sole difference between the testimony of the experts concerning the "reasonable time required for any fixturing work needed to be done prior to reopening the store," defendant contends that its inclusion in the instruction was improper. Its position is that a building is "rendered tenantable" as required by the policy when "the walls are up, the ceiling is up, [and] the heat is available"; that is, exclusive of any fixtures which a tenant might wish to install in order to operate its particular business. National, however, maintains that "tenantable" means restored to the condition in which it was *operating* at the time of the fire. Therefore, it asserts, since the building was leased to a subtenant under a continuing lease, the building will not be tenantable until such time as it is prepared for that subtenant; in this case, until it is equipped for operation as a supermarket, which would include necessary fixturing.

The trial court, apparently relying on language in the policy which refers to "the same tenantable condition as before the fire," concluded that the question of when a building is "tenantable" must be determined on a case-by-case basis, looking to the facts as they existed at the time of the fire. Since the building was sublet to a tenant required to operate a particular business who was actually operating that business at the time of the fire, the trial court reasoned that the building would be tenantable when prepared for that subtenant to continue under the lease.

Defendant presents two arguments on this issue. In the first, it appears to accept the trial court's reasoning, but argues that, looking at the situation at the time of the fire, it is clear that National did not own any of the fixtures and therefore would have no obligation to replace them. That being the case, it reasons, the building was tenantable when the subtenant could return and begin installing its own fixtures. Assuming *arguendo* the validity of this reasoning, which we

note was not presented to the trial court, we believe that the facts relied upon by defendant are not supported by the record before us. It directs us to the sublease between National and Nationwide Food & Liquors, Inc., entered into after the insurance policy in question was written, which recites that "[i]n the event of *** default and termination of this Sublease *** the Sublessor shall have the right *** of *repurchasing the store fixtures and equipment sold by Sublessor to Tenant this date as set out in the Bill of Sale *** for the sum of $500.00* ***." (Emphasis added.) Defendant argues that the above clause proves that the fixtures and equipment were sold to the subtenant; however, the bill of sale referred to in the sublease does not appear in this record. Therefore, we are unable to determine whether, as defendant contends, *all* of the equipment and fixtures were sold, or whether ownership of some was retained. If the latter is the case, then under defendant's own argument the time for restoring those fixtures which National still owned should be considered in computing the time in which the premises could be restored to the same tenantable condition as before the fire. It is unclear why defendant did not raise this argument before the trial court, or why it does not argue here that once the trial court determined that "tenantable" must be construed on a case-by-case basis, it should have submitted the question to the jury with appropriate instructions. In any event, this is a factual question, and since defendant does not purport to question the propriety of the trial court acting as trier of fact on this issue, we have no choice but to hold that its decision was not against the manifest weight of the evidence.

■ Defendant also takes the somewhat inconsistent position that, as a matter of law, the term "tenantable" does not include the time for fixturing. This argument is precisely contrary to the position it presented at trial; it did not object when the testimony offered by National included the time for fixturing, and it argued during the instruction conference that inclusion of the time for fixturing could not be determined as a matter of law but must be submitted to the jury as a question of fact. Ordinarily, issues and theories not presented to or considered by the trial court cannot be raised for the first time on review. (*Kravis v. Smith Marine, Inc.* (1975), 60 Ill. 2d 141, 324 N.E.2d 417.) Furthermore, we do not agree, as defendant now asserts, that the term "tenantable" is clear and unambiguous. It is reasonably susceptible to more than one meaning, which necessitates reliance on extrinsic facts to determine the intention of the parties. (*Sherbrooke Homes, Ltd. v. Krawczyk* (1980), 82 Ill. App. 3d 990, 403 N.E.2d 622.) Despite the ambiguity which it apparently recognized at

trial, defendant did not attempt to bring in any evidence concerning surrounding circumstances at the time of agreement or of any interpretation the parties themselves placed on the policy which both we and the trial court would need to determine the intention of the parties. (See *Farwell Construction Co. v. Ticktin* (1980), 84 Ill. App. 3d 791, 405 N.E.2d 1051.) In addition, it does not cite, nor has our own research discovered, any case, regulation, treatise, or other secondary authority which would aid in defining the word. Therefore, we believe that the trial court, presented with defendant's argument, would have found the term ambiguous and, in the absence of any evidence from which it could have ascertained the intention of the parties, and in the absence of any other authority which might aid in its interpretation, the only remaining alternative before the court would have been to apply what is admittedly a secondary rule of construction and construe the term most strongly against the drafter—in this case, defendant. (*Farwell Construction Co. v. Ticktin; Ricke v. Ricke* (1980), 83 Ill. App. 3d 1115, 405 N.E.2d 351.) For these reasons, we believe that the instruction in question was not improper, and the judgment for National in the amount of $100,000 for loss of rents should be affirmed.

The final question we must consider is whether the trial court abused its discretion in awarding attorney fees and a $5,000 penalty against defendant, pursuant to section 155 of the Illinois Insurance Code. (Ill. Rev. Stat. 1981, ch. 73, par. 767.) The allowance of fees and penalties under this provision is a matter resting within the judgment and discretion of the trial court in the first instance (*Songer v. State Farm Fire & Casualty Co.* (1980), 91 Ill. App. 3d 248, 414 N.E.2d 768), and its determination thereon is essentially a question of fact which will not be disturbed unless the record demonstrates that the court's discretion has been abused (*Fassola v. Montgomery Ward Insurance Co.* (1982), 104 Ill. App. 3d 825, 433 N.E.2d 378). Of course, a refusal to settle is not vexatious *per se,* and this section is not to be applied merely because an insurer has been unsuccessful in supporting its position at trial (*Deverman v. Country Mutual Insurance Co.* (1977), 56 Ill. App. 3d 122, 371 N.E.2d 1147); that is, where there is a *bona fide* dispute between the insurer and the insured. However, where the trial court has based its determination "upon an assessment of the totality of the circumstances" (*Fassola v. Montgomery Ward Insurance Co.* (1982), 104 Ill. App. 3d 825, 832, 433 N.E.2d 378, 383) and it is supported by instances of conduct by the insurer appearing in the record, its finding should be affirmed (see *Deverman v. Country Mutual Insurance Co.* (1977), 56 Ill. App. 3d 122, 371

N.E.2d 1147).

■ Because of the different dispositions on review of the two claims presented in this action, it is necessary to consider the attorney fees based thereon separately. With regard to the property loss claim, the trial court awarded the owners' attorney fees of $63,500 based on a finding the defendant's conduct was vexatious and unreasonable. Defendant argues that this award was improper because its refusal to settle was based on a *bona fide* dispute between the parties over the proper measure of damages to be assessed in the instant case. However, we note that, initially, in the relevant period prior to filing this action, the dispute between the parties was over the base figure; *i.e.*, the cost of repair, upon which defendant relied in making its offer. In discussing this issue at the hearing on plaintiffs' motion for attorney fees, the trial court expressed doubts about the *bona fides* of defendant's reliance on the Ensminger proposal, noting that this supposedly "firm offer" to do the work for the price quoted was never transmitted to the owners; that the proposal itself was made without consulting plans for the building and, as a result, the proposal did not take into account several items which should have been included; and that defendant generally had failed to undertake a reasonable investigation of the claim, despite the extreme difference between the Ensminger proposal and, not only the insured's proof of loss, but also the estimates of one of defendant's own adjusters. Although the court gave numerous reasons for its determination, each is based on the premise that the jury's verdict reflected an accurate appraisal of the owners' loss. However, as we noted in discussing that verdict, the jury was not properly instructed with regard to the appropriate measure of damages, and because the court's finding is so intimately related to the jury's verdict, it is our view that the question of attorney fees for prosecution of the property loss claim must await resolution of that claim upon retrial. Therefore, that portion of the court's order awarding the owners' attorney fees will be vacated with directions that the court reconsider the motion upon termination of the retrial.

■ However, we believe the trial court's award of $35,638.55 to National, based on the rental loss claim, is supported by the record. Shortly after the loss, on May 31, 1978, the site was inspected on defendant's behalf by Bruce Elliott, an insurance adjuster with Toplis & Harding, who estimated rental loss to be $75,000 and recommended that a reserve be established in that amount. Subsequently, the site was inspected by Elliott and Donald Mason, an adjuster for American International Underwriters, a group to which defendant belonged. In a

June 7, 1978, memo, Mason estimated a rental loss of $100,000 and recommended establishment of reserves in that amount. While the two adjusters insisted at trial that these figures were merely rough estimates, and that it is common for an insurance company to "overreserve," these were the only figures that defendant had when it rejected National's partial proof of loss in the amount of $45,000 as excessive. Thus, based on the information it had at that time, the partial proof of loss was not excessive, as defendant asserted in its letter of March 7, 1979. Moreover, several other reasons for rejection are set forth in that letter, yet defendant did not argue at trial, at the hearing on the motion for attorney fees, or in its appeal before this court that any of the other reasons advanced had any merit. Its sole argument that the proof of loss was rejected in good faith is an estimate by Elliott that the reasonable time required to render the building tenantable was seven months and a supposed agreement to hold the rental claim in abeyance until the property claim could be settled (an agreement which a witness for defendant at first denied making in testimony at trial, then stated that he could not recall entering into such an agreement). However, the estimate was not communicated to defendant until the end of February 1980, almost one year after the initial proof of loss was rejected and several months after National had engaged an attorney and filed this action in order to protect its rights. The agreement, too, did not arise, if one existed, until after defendant rejected the proof of loss. Moreover, while further negotiations might have been held in abeyance, the time for filing suit was not. Therefore, because of the initial denial, made at a time when defendant appears not to have had any reason to believe that it was excessive, National was required to engage legal counsel and file this action. Based on this evidence, we believe that the trial court's finding of vexatious and unreasonable conduct was not an abuse of discretion.

 One problem remains which the parties have not addressed. In addition to attorney fees, the trial court assessed a penalty of $5,000 against defendant, and the judgment was granted jointly to the owners and National. Defendant has not contested the court's action in awarding a penalty in addition to attorney fees; however, because we have determined that the award is to be reversed and remanded as to the owners but affirmed as to National, we believe that the trial court should have the opportunity of reconsidering assessment of the penalty; the statute allows the assessment of an amount "not to exceed *** $5,000" (Ill. Rev. Stat. 1981, ch. 73, par. 767), which we interpret to mean that the trial court may assess less than that amount. In the instant case, the trial court did not apportion the

penalty, and we therefore have no way of determining what portion thereof it attributed to defendant's conduct in relation to National.

For the reasons stated, the portions of the judgment awarding rental loss and attorney fees to National Tea are affirmed; the portions of the judgment awarding building loss and attorney fees to the owners is reversed; that portion of the judgment assessing a $5,000 penalty against defendant is also reversed, and this matter is remanded with directions to conduct further proceedings consistent with the views expressed herein.

Affirmed in part.

Reversed in part and remanded with directions.

WILSON, P.J., and MEJDA, J., concur.