EARL KANE, Plaintiff-Appellee, *v.* AMERICAN NATIONAL BANK & TRUST COMPANY, Defendant-Appellant.

(No. 73-10; 

Second District—August 6, 1974.

*Rehearing denied September 27, 1974.*

Reno, Zahm, Folgate, Skolrood, Lindberg & Powell, of Rockford, for appellant.

Hunter, Madden, Plager & Hasting, of Freeport, for appellee.

Mr. JUSTICE SEIDENFELD delivered the opinion of the court:

The plaintiff, Earl Kane, payee of two checks drawn on insufficient funds at the defendant bank, American National Bank & Trust Company (hereinafter American), sued to recover the balance due on the checks alleging that American had held the checks beyond its midnight deadline and thereby became liable to the plaintiff. The trial court entered judgment for $66,262.20, plus interest, and defendant appeals.

American contends that certain regulations of the Federal Reserve Board and operating circulars of the Federal Reserve Bank of Chicago apply to avoid the midnight deadline under the facts of this case; and that alternatively plaintiff has waived his right to claim that the bank is accountable under provisions of section 4—302 of the Uniform Commercial Code. Ill. Rev. Stat. 1971, ch. 26, par. 4—302 (hereinafter UCC).

On July 18, 1966, the plaintiff received two checks of the same date from the Heggemeier Livestock Corporation. At that time Heggemeier owed the plaintiff approximately $108,000 for lambs, feed and wool. The larger check, for $67,413.40, contained the notation "For Fat Lambs", and the smaller check, for $11,849.20, contained the notation "For Wool". The next day plaintiff delivered the checks without endorsing them to the Blackhawk Production Credit Association (BPCA) to whom he was indebted, and BPCA credited his account for the amount of the checks. BPCA deposited the checks at the Freeport State Bank on July 20 and the account of the association was so credited.

The checks went to the Continental Bank in Chicago, then the Federal Reserve Bank of Chicago, and were received by the defendant, American National, on Friday, July 22, 1966. American returned the checks that same day for lack of endorsement. Although at this time the Heggemeier Corporation account did not contain sufficient funds to cover payment on the checks, the checks were not so stamped and neither BPCA nor plaintiff was notified by American of Heggemeier's lack of funds. The checks returned in reverse order of their preceding journey and while at Continental were erroneously stamped "presented twice".

On July 26 the checks returned to the Freeport State Bank. BPCA was called and Mr. Hostetter from BPCA obtained a power of attorney from the plaintiff, who was leaving for a vacation. Mr. Hostetter came down

to the Freeport State Bank and supplied the missing endorsements. The checks were then sent back on the 27th; this time directly by mail to American at the request of BPCA. The checks were sent directly to American because the amounts were large and the collection time would have been much longer if the checks were processed through normal collection channels.

Accompanying the checks was a standard collection form containing instructions and identifying the sender, the checks, the amounts, and the date sent. The instructions printed in the lower right hand corner read: "We enclose for collection and return items as stated above.

INSTRUCTIONS:

NO PROTEST.

Surrender documents attached only on payment.

Return at once if not paid, stating reasons for non-payment.

Return this sheet. No other letter is necessary."

On Thursday, July 28, the checks were received at American by Bernice Collins, who worked at the draft-and-collection window of American. She ignored the instructions contained on the printed form which, she stated, was a matter of normal practice. At this time the Heggemeier account did not contain sufficient funds to cover the two checks.

On Friday, July 29, the midnight deadline expired.

On Tuesday, August 2, Freeport State Bank sent a tracer to American requesting advice on payment of the two checks sent for collection on Heggemeier Livestock Corporation. The tracer was returned by American on August 3, 1966, with the notation "Still NSF", and received by Freeport State Bank on the 4th.

Kane found out on Friday morning, August 5, that American planned to return the checks. He went to the Freeport bank and talked with BPCA's attorney. Friday evening Kane reached Heggemeier, president of the Heggemeier Livestock Corporation, and was told that Heggemeier had a balance of some $53,000. Plaintiff then wrote a check for $27,041.36 to Heggemeier to have him deposit it so plaintiff could then collect on the two Heggemeier checks at American. The check was drawn on an inactive account of plaintiff at the Sycamore Bank which had a balance at the time of only $31. The check was post-dated August 12, plaintiff expecting to increase his account in the interim.

Plaintiff told his attorney what he had done, his attorney was upset, and payment on this Sycamore check was stopped on August 10, after the Heggemeier checks were returned. There was also some fear that Heggemeier might divert the Sycamore Bank check for uses not contemplated.

On August 8, the Freeport State Bank called American to return the

two Heggemeier checks. On the 9th they were received at Freeport and BPCA's account was charged back for the amount of the checks. Kane's account with BPCA was also charged back for the amount of the returned checks. Kane then made other arrangements with BPCA to repay his loan to them, and BPCA returned the checks to Kane. After the checks were returned to BPCA, Kane received $13,000 from Heggemeier and elected to apply it on the larger check.

American argues that former Federal Reserve Regulations G[1] and J,[2] and former Operating Circulars No. 4[3] and No. 7[4] of the Federal Reserve Bank of Chicago, all in effect at the time the Heggemeier checks were sent to American, require that the checks when sent directly to American be treated as "non-cash items" with the result that the midnight deadline would not apply. American reasons that because the checks were sent directly accompanied by special instructions they required special handling so that American became only "an agent for collection" (former Reg. G, 12 C.F.R., sec. 207.3(c), and former Operating Circular No. 7, par. 13(c)), and was required only to give "credit when paid". Former Operating Circular No. 4, par. 24.

The plaintiff contends, *inter alia,* that the Federal Reserve Regulations do not apply to this transaction. We agree. Federal Reserve Regulations G and J and the operating circulars thereunder relied upon by American do not apply to collections of items not sent through the Federal Reserve collection channels.

The relevant purposes of former Regulation G and Regulation J are to provide rules governing the clearing house operations provided by the Federal Reserve system for the collection of cash and noncash items, and to protect the Federal Reserve system from liability and inconveniences in conducting these operations. There is thus no need and no purpose in the Federal Reserve system regulating check clearing procedures that operate outside its system and have no effect on it.

The regulations and operating circulars relied upon themselves disclose that they only apply to regulate Federal Reserve transactions. Former Regulation G provides for regulation where banks send noncash items to any Federal Reserve bank for collection (12 C.F.R. sec. 207.3(a)) and also prescribes the authority for Reserve banks to promul-

---

[1] 12 C.F.R. sec. 207 (eff. Aug. 21, 1959, as amended Jan. 1, 1964 and Sept. 1, 1964). Regulation G has since been consolidated under Regulation J (12 C.F.R. sec. 210) effective Sept. 1, 1967.

[2] 12 C.F.R. sec. 210 (1960 as amended eff. Sept. 27, 1962 and Sept. 1, 1964).

[3] Revised Sept. 1, 1964, as amended by Supp. No. 1, May 5, 1965, and Supp. No. 2, July 12, 1965.

[4] Revised Sept. 1, 1964, as amended by Supp. No. 1, May 5, 1965.

gate rules, but limits the binding effect of such rules to member or non-member banks "which send any noncash item to such Federal Reserve banks for collection". (12 C.F.R. sec. 207.4.) Former Operating Circular No. 7 promulgated under Regulation G by the Federal Reserve Bank of Chicago limits its applicability to the collection of items passing through the Federal Reserve Bank of Chicago; paragraphs 1 and 6 of the circular state that Regulation G and the circular prescribe the terms and conditions upon which the Federal Reserve Bank of Chicago will receive and handle noncash items for collection. See also former Fed. Res. Reg. J, 12 C.F.R. secs. 210.2(b), 210.5. 210.6; former Operating Circular No. 4, par. 1.

Since the Federal regulations have no controlling applicability to the transaction before us, the case must be decided under the provisions of the Uniform Commercial Code, supplemental principles of law and the agreements of the parties.

■■■ Under the Commercial Code, sending checks for collection directly to the drawee bank constitutes a valid method of presentment. (UCC § 4—204; *Central Bank & Trust Co. v. First Northwest Bank* (E.D. Mo. 1971), 332 F.Supp. 1166, 1169, *aff'd*, 458 F.2d 511; *Farmers Cooperative Livestock Market, Inc. v. Second National Bank of London* (Ky.App. 1968), 427 S.W.2d 247.) In the absence of an agreement authorizing the payor bank to do otherwise, such bank normally will be accountable or liable for retaining demand items beyond its midnight deadline without paying or returning the items or sending notice of dishonor. (UCC § 4—302(a); *Rock Island Auction Sales, Inc. v. Empire Packing Co., Inc.* (1965), 32 Ill.2d 269; *Central Bank & Trust Co. v. First Northwest Bank* (E.D. Mo. 1971), 332 F.Supp. 1166, 1169, *aff'd*, 458 F.2d 511.) The fact that the checks were sent "for collection" does not alter this result.[1] (*Farmers Cooperative Livestock Market, Inc. v. Second National Bank of London* (Ky.App. 1968), 427 S.W.2d 247, 249-250.) In the instant case the desire to expedite the collection process was the reason the Heggemeier checks were sent directly by mail to American (see also Official Comment 2 to UCC § 4—204), and an instruction requesting immediate return if not paid accompanied the checks. Yet American held the checks without paying, returning, or notifying Freeport State Bank of dishonor until Freeport sent a tracer which was re-

---

[1] American does not make the argument in this appeal that sending checks directly "for collection" to the payor bank, by normal banking practices, is understood to authorize or permit the payor bank to hold such checks beyond the midnight deadline. (See UCC § 1—205(2)—(5).) Because American was instructed to return the checks at once if not paid, the argument, if made, could not succeed in any event.

turned almost a week later by American.. Under these circumstances we conclude that American should be held accountable for the unpaid balance of the checks, unless, as defendant further claims, plaintiff has ratified or waived defendant's nonaction.

After the midnight deadline expired, the plaintiff issued a check on August 5, 1966, to Heggemeier for $27,041.36, and postdated it August 12. His purpose in doing so was to have Heggemeier deposit the check to the Heggemeier account at American which plaintiff was told had a balance of $53,000. Heggemeier's account would then total approximately $80,000 so that plaintiff's checks from Heggemeier, totaling $79,262.60, could be paid. The check contained the notation "Feed Bill to date Pd. in full" above the endorsement. Heggemeier attempted to deposit this check at American before his checks to plaintiff were returned, but American, according to the testimony of one of its officers, did not "like the looks" of the check and refused to accept it for collection. On August 10, after the Heggemeier checks to plaintiff were returned, plaintiff stopped payment on the $27,041.36 check he gave to Heggemeier.

American argues that plaintiff's action in delivering the check to Heggemeier waived his right to complain or constituted a ratification of American's failure to observe its midnight deadline. American's claim of waiver and ratification is based upon the reasoning that plaintiff's plan to have his post-dated check deposited in Heggemeier's account to make good the Heggemeier checks at American could not have succeeded unless American continued to hold the Heggemeier checks for collection beyond the midnight deadline.

American first points to UCC § 1—107, and contends the plaintiff's check delivered to Heggemeier constituted a written waiver of plaintiff's rights under UCC § 4—302 against American.

UCC § 1—107 provides:

> "Any claim or right arising out of an alleged breach can be discharged in whole or in part without consideration by a written waiver or renunciation signed and delivered by the aggrieved party."

■■ UCC § 1—107's counterpart for commercial paper is contained in UCC § 3—605. Neither UCC § 1—107 nor UCC § 3—605 seems to apply to breach of a statutory duty and consequent liability imposed by statute. Even if the applicability of these sections to the type of liability in question is assumed, we cannot conclude that plaintiff's check to Heggemeier was intended to be or contained sufficient formal requisites to constitute a written waiver or renunciation as contemplated by UCC § 1—107 and UCC § 3—605. Thus the determination of whether plaintiff's delivering

of a check to Heggemeier signifies an effective implied waiver is to be decided by resort to principles of the law of waiver which exist outside the Commercial Code. UCC § 1—103.

■■ Both parties agree on the applicable definition of waiver as stated in *Ferrero v. National Council of Knights and Ladies of Security* (1923), 309 Ill. 476, 481:

> "To constitute a waiver it is essential that there is an existing right, benefit or advantage, knowledge, actual or constructive, of its existence, and an intention to relinquish it * * *."

See also *Vermilion County Production Credit Ass'n v. Izzard* (1969), 111 Ill.App.2d 190, 195.

Generally, to make out a case of implied waiver of a legal right there must be a clear, unequivocal, and decisive act of the party showing such a purpose. (*Jacksonville Hotel Building Corp. v. Dunlap Hotel Co.* (1931), 264 Ill.App. 279, 319, *aff'd*, 350 Ill. 451; *Klim v. Johnson* (1958), 16 Ill.App.2d 484, 493; 28 Am.Jur.2d *Estoppel & Waiver* § 160 (1966); 92 C.J.S. (Waiver) 1064 (1955).) An implied waiver may arise where a person against whom the waiver is asserted has pursued such a course of conduct as to sufficiently evidence an intention to waive a right or where his conduct is inconsistent with any other intention than to waive it. (28 Am.Jur.2d *Estoppel & Waiver* § 160 (1966); 92 C.J.S. (Waiver) at 1061, 1963—4 (1955); *Globe Brewing Co. v. American Malting Co.* (1909), 152 Ill.App. 194, 198, 200-201, *rev'd on other grounds*, 247 Ill. 622.) The burden of proof is upon the party claiming a waiver to prove the facts upon which he relies for such waiver. *Ferrero v. Knights of Security* (1923), 309 Ill. 476, 481.

■■ In applying the above rules to the facts of the case before us, we note that plaintiff's check to Heggemeier was made out in an odd amount and contained the notation "Feed Bill to date Pd. in full" above the endorsement, which does not suggest to an uninformed party that this check was related to the Heggemeier checks which are the subject of this litigation. While it appears from the record that the notation was Heggemeier's idea, the effect of the procedure used was to disguise from American the true nature of the transaction taking place. From this it may reasonably be inferred that the presentment of the $27,041.36 check was not an unequivocal act showing an intention to relinquish any right of action against American; nor could it be considered a specific approval or ratification of the bank's conduct in disregarding its midnight deadline and the instruction accompanying the checks to return them immediately if not paid.

Additionally we note that American refused to accept plaintiff's check to Heggemeier for collection. A waiver or ratification may be ineffectual

because it is conditional and the attached condition fails or is rejected. (See *Schenck v. State Line Telephone Co.* (1924), 238 N.Y. 308, 312-313, 144 N.E. 592, 593-594; *Jordan v. City of Beaumont* (Tex. Civ. App. 1960), 337 S.W.2d 115, 118-119; *Andrews v. Powell* (Tex. Civ. App. 1951), 242 S.W.2d 656, 661.) In the instant case plaintiff's attempt to collect at least $52,000 on the Heggemeier checks was contingent for its success on American accepting plaintiff's check for collection. Having refused to do so, American cannot now successfully urge that the attempt constituted a valid waiver or ratification of its failure to timely return the Heggemeier checks.

For the reasons stated, we affirm the judgment of the trial court.

Affirmed.

GUILD and RECHENMACHER, JJ., concur.