**UNIVERSAL FIRE & CASUALTY INSURANCE CO., an Indiana Company, Plaintiff–Appellee,**

v.

**Mark JABIN and Lelia Jabin, Defendants–Appellants.**

**Nos. 92–3827 and 93–1067.**

United States Court of Appeals, Seventh Circuit.

Argued June 7, 1993.

Decided Feb. 16, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied May 5, 1994.

Craig M. White (argued), Martha D. Owens, Wildman, Harrold, Allen & Dixon, Chicago, IL, for plaintiff-appellee.

R. Dickey Hamilton, Edward W. Feldman (argued), Diane F. Klotnia, Miller, Shakman, Hamilton, Kurtzon & Schlifke, Kenneth L. Schmetterer, Office of the Corp. Counsel, Appeals Div., Chicago, IL, for defendants-appellants.

Before ALDISERT,* BAUER, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

In 1986, Mark and Lelia Jabin hired Jerri Neal, doing business as Janco Realty & Management, to manage several commercial properties the Jabins owned. One of these properties was 213 S. Homan in Chicago. In the management agreement, the Jabins gave Neal authority "[t]o carry, at [the Jabins'] expense, public liability and workmen's com-

pensation insurance adequate to protect the interests of the parties hereto...."

On August 8, 1989, Universal Fire & Casualty Insurance Company ("Universal") issued the Jabins a one year, $500,000 commercial liability policy on their properties, including 213 S. Homan. Universal charged a $25,726 premium for the policy. In September, Neal arranged to pay this premium by financing it with the Imperial Premium Finance Company ("Imperial"). The resulting premium finance agreement lists the Jabins as borrowers and bears Neal's signature as their "agent." It indicates that the Jabins made a downpayment of $6,649 and promised to pay Imperial nine monthly installments of $2,335.49. The premium finance agreement also contains a power of attorney provision in which the Jabins agreed to

> irrevocably appoint[ ] Imperial as its Attorney–in–Fact with complete authority to cancel the Policies, to demand, collect, sue for, receive and give receipt for all sums assigned above to Imperial and to execute and deliver on [the Jabins'] behalf all documents, forms and notices relating to the Policies in furtherance of this Agreement.

Imperial paid Universal the amount of the Jabins' premium in full as promised, and received installment payments from the Jabins for September through November, but not December of 1989. In late December, Imperial took steps to cancel the Jabins' insurance policy for nonpayment pursuant to the power of attorney provision in the premium finance agreement. Imperial alleges that before it cancelled the policy with Universal, it mailed the Jabins a ten day notice of intent to cancel and then a notice of cancellation, in compliance with the Illinois Premium Finance Act, Ill.Rev.Stat. ch. 73 ¶ 1065.60 *et seq.* (1991). The Jabins dispute Imperial's evidence of mailing and deny ever having received such notices. In any event, Universal received Imperial's cancellation request on January 2, and cancelled the Jabins' policy beginning January 3.

As fate would have it, misfortune struck on January 18, 1990. That day, Jerome Cannon

---

* The Honorable Ruggero J. Aldisert, Circuit Judge of the United States Court of Appeals for the Third Circuit, is sitting by designation.

fell to his death, allegedly through a hand railing and bannister around the second floor porch of 213 S. Homan. In February 1991, the Cannon Estate filed a wrongful death suit against the Jabins. Cannon's attorney sent the Jabins a notice of their claim and an attorney's lien, and Neal forwarded this material to Universal. Universal responded with a March 26 letter denying coverage for the Cannon accident, stating that the Jabins' policy had been cancelled for nonpayment. After the Jabins' protestations, however, Universal on April 22 offered to defend the Jabins against the Cannon action, subject to a reservation of rights.

In June, Universal once again decided to deny coverage and it brought this declaratory judgment action against the Jabins, Neal, and the Cannon Estate. It sought a declaration that it properly cancelled the Jabins' policy and therefore had no obligation to defend or indemnify the Jabins against the Cannon action. The Jabins and Universal filed cross motions for summary judgment, and the district court granted summary judgment in favor of Universal and against the Jabins. The Jabins timely filed this appeal.

The Jabins essentially advance the same three arguments on appeal as they did in the district court. First, they contend that the insurance policy was in effect at the time of the Cannon accident because Imperial failed to notify them before it attempted to cancel the insurance policy. They argue that the Illinois Premium Financing Act prevents a premium finance company from validly cancelling a policy with an insurer if the finance company does not comply with the Act's notice provisions. Second, they assert that Universal waived its right to deny coverage on cancellation grounds by not specifically reserving this right in its April 22 letter. Third, the Jabins claim that Neal had no authority to enter into the premium finance agreement with Imperial, and thus Imperial had no authority to cancel the policy with Universal.

### Standard of Review

We review grants of summary judgment *de novo* to determine whether any genuine issue of material fact exists and whether the moving party is entitled to judgment as a matter of law. *Williams v. Anderson*, 959 F.2d 1411, 1413 (7th Cir.1992).

### The Illinois Premium Finance Act

The Illinois Premium Financing Act, Ill.Rev.Stat. ch. 73 ¶ 1065.68 (1991) provides:

§ 521. Cancellation of Insurance Contract Upon Default. When a premium finance agreement contains a power of attorney enabling the premium finance company to cancel any insurance contract or contracts listed in the agreement, the insurance contract or contracts shall not be cancelled by the premium finance company unless such cancellation is effectuated in accordance with this Section.

(1) Not less than 10 days written notice shall be mailed to the insured of the intent of the premium finance company to cancel the insurance contract unless the default is cured within such 10 day period.

(2) After expiration of such 10 day period, the premium finance company may thereafter request in the name of the insured, cancellation of such insurance contract or contracts by mailing to the insurer a request for cancellation, and the insurance contract shall be cancelled as if such request for cancellation had been submitted by the insured himself, but without requiring the return of the insurance contract or contracts. The premium finance company shall also mail a copy of said request for cancellation to the insured at his last known address.

The Jabins do not claim that Universal violated the Act. They claim only that Imperial, the finance company, violated the Act, and that because of this violation, Universal, the insurer, must honor the insurance contract as if it had never been cancelled. Like the district court, we assume that Imperial failed to give the Jabins the required notice in order to determine whether a premium finance company's noncompliance with the Act voids a cancellation by the insurer under Illinois law. We hold it does not.

Neither the Illinois Supreme Court nor the Illinois Appellate Court has ruled upon the issue we are asked to address. In diversity

cases such as this one involving issues of state law "which have not yet been precisely articulated by the courts of Illinois," we are obligated to "apply the state law that would be applied in this context by the Illinois Supreme Court." *Green v. J.C. Penney Auto Ins. Co.,* 806 F.2d 759, 761 (7th Cir.1986) (citing *Hill v. International Harvester Co.,* 798 F.2d 256, 261 n. 12 (7th Cir.1986)). No legislative history exists to aid us in interpreting the Act. Therefore, in light of the dearth of authority construing the Act, we rely, as Illinois reviewing courts do, particularly on the plain language and ordinary meaning of the statute for its interpretation. *See Hill v. Butler,* 107 Ill.App.3d 721, 63 Ill.Dec. 385, 437 N.E.2d 1307 (1982).

The Jabins draw our attention to the language in the Act that provides that an insurance contract "shall not be cancelled" unless the insured is notified of the impending cancellation. They maintain that "a necessary corollary of this language is that a cancellation that violates that section is no cancellation at all, it is invalid and void." What the Jabins dismiss as "meaningless," however, are the words immediately following the language they quote. The Act does not merely provide that the contract "shall not be cancelled," it provides that "the insurance contract ... shall not be cancelled by the *premium finance company* unless such cancellation is effectuated in accordance with this Section." (emphasis added). Although the Act clearly requires that the Jabins be notified before the cancellation of their insurance policy, the Act also directs and limits its dictates to premium finance companies.

The Illinois Premium Finance Act, by its very name, governs premium finance companies and premium finance agreements. Beside the provision at issue in this case, the Act also regulates the licensing of premium finance companies, prescribes the form premium finance agreements shall take, dictates the maximum service charge premium finance companies may collect from insureds, and directs premium finance companies'

recordkeeping practices. Ill.Rev.Stat. ch. 73, ¶ 1065.60 *et seq.* By exclusively detailing the rights and duties of premium finance companies, the Act operates to protect insureds against potential abuses by these companies, such as fraud or mistaken policy cancellation. Thus the plain language of paragraph 1065.-68, mandating that premium finance companies refrain from cancelling insurance contracts until they properly notify the insured, comports with the Act's function to regulate premium finance companies and protect insureds.

Paragraph 1065.68 creates a specific duty in a premium finance company to protect an insured against a wrongful or unexpected policy cancellation by requiring the company to first notify the insured and grant him or her a 10 day opportunity to cure a default in payment before it executes any power of attorney it may have to cancel the insured's policy. To enforce a premium finance company's compliance with this duty, the statute confers upon the insured a cause of action against the premium finance company for any cancellation it effectuates in breach of the Act's notice requirements. Hence, properly construed, the Act would operate to protect the Jabins in their situation. It would do so by giving the Jabins recourse against *Imperial,* provided they could prove Imperial failed to notify them before it instructed Universal to cancel the policy.

However, to construe paragraph 1065.68 as reaching beyond premium finance companies to protect insureds by giving them recourse against insurers as well, would torture the Act's ordinary meaning. Paragraph 1065.68 specifically addresses its commands to premium finance companies, and neither the paragraph nor the rest of the Act addresses insurers.[1] We could not fairly read the phrase, "shall not be cancelled by the premium finance company," to mean "shall not be cancelled by the premium finance company *or* the insurance company," without creating

---

1. In fact, as Universal notes, the Act's scope provision states that the Act applies to "any person, corporation or association engaged in the business of financing insurance premiums, entering into premium finance agreements or other-

wise acquiring premium finance contracts" and exempts "[c]redit unions, banks, savings and loan associations, [and] insurance companies...." Ill.Rev.Stat. ch. 73, ¶ 1065.60 (1991).

in the Act a requirement that otherwise does not exist.

From Universal's perspective, on January 2 it received from Imperial a cancellation request and a statement that Imperial had complied with state law before making the request. It had no statutory notice obligations of its own, and therefore it honored Imperial's power of attorney to cancel on behalf of the insured. Universal appeared to have met all of its statutory and contractual obligations before cancelling the Jabins' policy.

If we were to hold that insurers in Universal's position nonetheless could not effectively cancel their policies due to the finance company's violation of the Act, then we would charge insurers with bearing the burden of the finance company's duty to notify. To effectively cancel financed policies, insurers could not rely on the finance company's assurances of compliance with the Act, but would have to take independent steps to verify that the premium finance company had actually mailed the required notice to the insured. Alternatively, insurers would be obligated to cancel a policy upon the finance company's request, and refund the premium at the peril of having the policy later be resurrected if it is discovered that the finance company failed to meet its notice requirements. We refuse to read the premium financing statute as making insurers responsible for the wrongdoing of premium finance companies.

The Jabins argue that our reading of the statute would "mak[e] the language of the Act superfluous" and "lead[ ] to absurd results" because under our interpretation of the Act, an insured may still have his policy effectively lapse though the premium finance company did not comply with the Act's notice provisions. They correctly cite *Cooke v. Insurance Co. of North Amer.*, 603 So.2d 520 (Fla.Dist.Ct.App.1992)[2] and *Kende Leasing*

*Corp. v. A.I. Credit Corp.*, 217 N.J.Super. 101, 524 A.2d 1306 (App.Div.1987) to support their position. Because in our view, the statute in *Cooke* is sufficiently different from the Act to be distinguishable,[3] we examine only the New Jersey Superior Court's approach to underscore our holding.

Like Illinois, New Jersey has an Insurance Premium Financing Act, the cancellation provisions of which are essentially identical to the Illinois Premium Financing Act. In *Kende,* the court held that the premium finance company's "failure to mail ... a notice of intent to cancel rendered ineffective the subsequent notice of cancellation. Therefore, Kende's policy was in effect at the time of the ... fire...." *Kende,* 524 A.2d at 1313. The court rejected the insurer's position that "the purpose of [the statute] is fulfilled as long as the insured whose policy was cancelled has a cause of action for breach of duty against the premium finance company which neglected to send the insured a notice of intent to cancel." *Id.* at 1311. It reasoned that the statute was "intended to help an insured keep his policy from lapsing, not to give him recourse against a finance company once the hardships of not having coverage have already befallen him." *Id.* at 1311–12. Thus, the court refused to absolve the insurance company "in light of the underlying purposes" of the statute. *Id.* at 1312.

We decline to follow the *Kende* court's approach for several reasons. First, we disagree that by reading the statute to create a duty in a premium finance company, we render the provision meaningless. On the contrary, we believe that to read the statute to require insurers either to verify finance companies' compliance with the Act before it can cancel a policy, or else consider every cancellation by a premium finance company tentative until compliance has been proven, is to give the statute a meaning it cannot bear. Moreover, without legislative history or Illi-

---

**2.** In *Cooke,* the District Court of Appeals certified the question regarding its premium finance cancellation provision to the Florida Supreme Court. Since the time the parties in this case submitted their briefs, the Florida Supreme Court has confirmed the District Court of Appeals' holding. *See Insurance Co. of North Amer. v. Cooke,* 624 So.2d 252 (Fla.1993).

**3.** Florida's premium finance cancellation statute provides: "[w]hen a premium finance agreement contains a power of attorney ... the insurance contract shall not be canceled unless cancellation is in accordance with the [notice] provisions...."

nois caselaw, we are reluctant to ascribe to the Act the "underlying purpose" of preserving an insured's policy at the insurer's expense rather than of providing the insured with a legal remedy against the transgressing finance company, especially when the plain meaning of the statute dictates otherwise.

Therefore, we agree with the district court that under Illinois law, Universal effectively cancelled the Jabins' policy regardless of Imperial's failure to notify.

### Waiver of Cancellation

■ The Jabins next contend that Universal's April 22 letter offering to "continue to handle [the Jabins'] claim even though a coverage question exists" constitutes an implied waiver of Universal's right to deny coverage on cancellation grounds. They claim that the letter "is flatly inconsistent with, and clearly reverses the position taken in, Universal's earlier March 26 letter denying coverage" because it purportedly only reserves the right to deny coverage on two grounds unrelated to cancellation.

The April 22 letter opens by stating that coverage under the policy is conditioned on Universal receiving prompt notice of and all legal papers relating to any lawsuit filed against an insured. The letter then concludes:

> Subsequently [sic], Universal Fire & Casualty is notifying you of its Reservation of Rights for the above-mentioned reasons.... However, no act of any company representative while investigating, negotiating settlement of the claim or defending a lawsuit shall be construed as waiving any Company rights. The Company reserves the right, under the policy, to deny cover-

age to you or anyone claiming coverage under the policy.

> There may be other reasons why coverage does not apply. We do not waive our right to deny coverage for any other reason which may arise.

The letter does not mention the March 26 denial of coverage or cancellation of the policy for nonpayment.

■ Under Illinois law, "an insurer is not required to assert all of its defenses to liability in a letter to its insured" to avoid waiving those defenses. *Tobi Eng'g v. Nationwide Mut. Ins.*, 214 Ill.App.3d 692, 158 Ill.Dec. 366, 368, 574 N.E.2d 160, 162 (1991) (citing *Tibbs v. Great Cent. Ins. Co.*, 57 Ill. App.3d 866, 15 Ill.Dec. 146, 373 N.E.2d 492 (1978)).[4] Rather, waiver is defined as " 'either an express or implied voluntary and intentional relinquishment of a known and existing right.' " *National Tea Co. v. Commerce & Indus. Ins.*, 119 Ill.App.3d 195, 74 Ill.Dec. 704, 711, 456 N.E.2d 206, 213 (1983) (citing *Ames v. Crown Life Ins. Co. of Toronto, Canada*, 85 Ill.App.3d 203, 40 Ill.Dec. 521, 523, 406 N.E.2d 222, 224 (1980)). A court may imply waiver from an insurer's conduct; however, "where waiver is implied from conduct, the act relied upon must be clear, unequivocal, and decisive." *Id.*, 74 Ill.Dec. at 705–06, 456 N.E.2d at 213–14 (citing *Kane v. American Nat'l Bank & Trust Co.*, 21 Ill. App.3d 1046, 316 N.E.2d 177 (1974)). Here, although Universal does not specifically mention cancellation, its April 22 letter also does not evidence a "clear, unequivocal, and decisive" intention to relinquish its right to raise that previously asserted ground for denying coverage. In fact, Universal repeatedly states that it does not intend the letter to waive any of its rights to deny coverage. Contrary to the Jabins' assertion then, the

---

4. The Jabins urge that insurers *are* required to specify all its defenses to liability in a letter to the insured. They cite *Royal Insur. Co. v. Process Design Assoc.*, 221 Ill.App.3d 966, 164 Ill.Dec. 290, 582 N.E.2d 1234 (1991) and *Cowan v. Insurance Co. of North Amer.*, 22 Ill.App.3d 883, 318 N.E.2d 315 (1974) for the proposition that in a reservation of rights letter, the insurer must "make specific reference to the policy defense which may ultimately be asserted" or else waive that defense. *Cowan*, 318 N.E.2d at 326. We agree with the district court that *Royal* and *Co-*

*wan* do not control this case. *Royal* and *Cowan* are limited to instances in which the insurer must fully inform the insured that if he or she accepts the insurer's offer to defend, the insurer reserves the right to raise certain specified defenses during the course of its representation of the insured that may cause a serious conflict of interest between insurer and insured. Since Universal is not defending the Jabins at all, and no such conflict of interest arises in this case, Universal is not required to specify its defenses.

letter does not directly contradict the March 26 letter, since it does not condition coverage solely upon the two enumerated grounds. The letter instead warns that "there may be other reasons why coverage does not apply."

In *National Tea,* the Illinois Appellate Court held that it was "impossible to imply a waiver" from a letter that "was not intended as a waiver and that ... reserved the right to assert any other rights or defenses 'which may exist or later become known to exist.'" *Id.,* 74 Ill.Dec. at 712, 456 N.E.2d at 214. This general language of reservation in *National Tea* is similar to the language of reservation in Universal's letter to the Jabins. Accordingly, we agree with the district court that Universal's April 22 letter was not an implied waiver of its cancellation argument.

### Agent's Authority to Enter into Finance Agreement

■ Finally, we address whether the Jabins' insurance policy was in effect at the time of the Cannon accident because Neal lacked authority to enter the finance agreement with Imperial, leaving Imperial without a power of attorney to cancel the policy. The Jabins contend that the district court erred in holding that Neal had implied authority to enter into the premium finance agreement and that a genuine issue of material fact exists with regard to whether Neal had actual or apparent authority. Because we hold that Neal had implied authority to enter the finance agreement as a matter of law, we do not address whether there was a factual dispute over actual or apparent authority.

■ The parties do not dispute that the management agreement between the Jabins and Neal expressly grants Neal the authority to carry insurance for the Jabins without specifying the manner in which Neal is supposed pay for the insurance premiums. The Jabins argue that because they never expressly granted Neal authority to finance the Jabins' insurance premiums, Neal had no actual authority to enter into the premium finance agreement with Imperial. In Illinois, however, "[a] principal is bound not only for the precise act which he expressly authorized the agent to do, but also for whatever belongs to the doing of it or is necessary to its performance." *Advance Mortgage Corp. v. Concordia Mut. Life Ass'n,* 135 Ill.App.3d 477, 90 Ill.Dec. 225, 229, 481 N.E.2d 1025, 1029 (1985) (citing *Saint Ann's Home for the Aged v. Daniels,* 95 Ill.App.3d 576, 51 Ill.Dec. 64, 420 N.E.2d 478 (1981)). " 'Every general power implies every particular power reasonably necessary to its exercise or performance.... [A]n agent has implied authority for the performance or transaction of anything reasonably necessary to effective execution of his express authority.'" *Id.* (quoting 2A C.J.S. *Agency* § 154 (1972)).

■ General principles of agency law recognize that "the power to lend or borrow money is not to be inferred without clear evidence of such a grant...." 2A C.J.S. *Agency* § 192. "An agent's power ... to borrow money is not subject to implication from a mere general authority, but requires designation in express terms, unless ... the duties of the agent are such in nature as to render it reasonably requisite for him to borrow ... in order to carry out his instructions and the duties of his office." *Id.* (citations omitted). In other words, "an agent is not authorized to borrow unless such borrowing is usually incident to the performance of acts which he is authorized to perform for the principal." Restatement (Second) of Agency, § 74 (1958).

The management agreement expressly calls for Neal to procure insurance for the Jabins in the course of her duties as manager of their properties. The Jabins placed no limitations on Neal's authority to acquire an insurance policy, and apparently did not give her the means to pay for it. In order to discharge her duty to insure the Jabins' properties, Neal had to pay the $25,726 premium somehow. The district court did not imply Neal's authority to enter the financing agreement from a "mere general authority" stemming from the agency relationship. Rather, it found that premium finance agreements were "common commercial transactions" that were "reasonably necessary" to Neal's performance of her authority to obtain insurance coverage on behalf of the Jabins. *Universal Fire & Casualty Insur. Co. v. Jabin,* No. 91–3606, 1992 WL 566294 (N.D.Ill. Oct. 23, 1991). Because we also

conclude that entering the finance agreement was reasonably incident to the effective execution of Neal's express authority, we agree with the district court that Neal had implied authority to bind the Jabins to the premium finance agreement and to the power of attorney provision in that agreement.

*Conclusion*

For the foregoing reasons, the district court's grant of summary judgment in favor of Universal and against the Jabins is AFFIRMED.

ALDISERT, Circuit Judge, dissenting.

"How you come out in this case depends on how you go in."

I'm not sure when I first heard this phrase or who said it, but I think it applies here.

In this appeal, the Jabins anchor their main contention on provisions of the Illinois Premium Finance Act, Ill.Rev.Stat. ch. 73 ¶ 1065.68, and argue that the finance company, Imperial, failed to observe the notice provisions of the Act when canceling their policy. Imperial's failure, in turn, rendered the insurance company's subsequent cancellation void. The insurance company, Universal Fire and Casualty, Inc., responds that Imperial's notice did comport with the statutory requirements, to-wit, that all premium finance companies provide ten days written notice to the insured of an intent to cancel an insurance contract. It also contends that it had no obligation to ensure that Imperial complied with the Act.

The argument presented to us followed a narrow compass: The parties limited their discussion to the Premium Finance Act. In so doing, both parties missed the jurisprudential boat.

**I.**

I believe that the basic tenets of Illinois insurance law govern the interpretation of the contract between Universal, the insurer, and the Jabins, its insured, rather than the Premium Finance Act as argued by the parties and accepted by the majority. In my view, the proper question for decision is whether Universal, in relying on the notice representations of Imperial, met the high standard of care under Illinois law for terminating an insurance policy.

The facts here are simple and not controverted:

1. Universal gave no actual notice to its insured that it was canceling their insurance contract. It relied solely on the representations of Imperial, a finance company, which was not a party to the insurance contract nor a third party beneficiary.

2. Rather than giving actual notice to its policyholders, Universal relied on boilerplate language found on the back of Imperial's letter canceling the Jabins' policy:

The Lender hereby acknowledges and affirms that written notice of the exercise of its right and intent to cancel has been mailed to the insured pursuant to appropriate state law.

App. at 44.

3. Imperial offered no evidence that it gave actual and timely notice to the Jabins. It could not even rely on the presumption of delivery to them of a letter notice placed in the U.S. mails. The sole evidence presented was that Imperial delivered the letter to a private presort service.[1]

"Insurance companies must be held to a strict standard with reference to termination and forfeiture of insurance contracts for nonpayment of [a] premium." *Horan & Co. v. Republic Ins. Group,* 175 Ill.App.3d 735, 737, 125 Ill.Dec. 247, 530 N.E.2d 275 (1988). I believe that under this "strict standard," the insurer must do more than sleep on boilerplate language contained in a standardized form provided by a third party. This is particularly true when the third party is acting in its own best interests and not those of the insured. *See Holbrook v. Institutional Ins. Co. of Am.,* 369 F.2d 236, 240 (7th Cir. 1967). And that is precisely what Universal did here. It did nothing to ascertain wheth-

---

1. In this respect, I disagree with the majority's narrative of the facts. They state that "Imperial ... mailed the Jabins a ten day notice." Maj.Op. at 1466. There is no evidence that the notice was placed in the custody of the U.S. Postal Service.

er its insured received actual notice of the finance company's intent to cancel the policy.

## II.

Illinois law requires insurance companies to do more, much more, before they can proceed with the draconian act of terminating an insurance policy. It is well established that an "insurance policy is a contract between the insurer and the insured party," *Copley v. Pekin Ins. Co.,* 111 Ill.2d 76, 85, 94 Ill.Dec. 757, 488 N.E.2d 1004 (1986), and that "a public policy favoring communications between insurance companies or agents and policy holders regarding cancellations or non-renewals of insurance is evidenced by section 143.18 of the Illinois Insurance Code." *See Guarantee Trust Life Ins. Co. v. Gilldorn Ins. Midwest Corp.,* 240 Ill.App.3d 707, 181 Ill.Dec. 490, 608 N.E.2d 563 (1992) (section provides that no cause of action shall lie for written or oral statements pertaining to a notice of cancellation).

The policy favoring direct communication between the insurer and the insured is at the heart of the strict standard imposed on insurance companies when canceling a policy. Illinois law permits an insurer to delegate to another the authority to send a cancellation notice, but it does not sanction the delegation of the ultimate responsibility to ascertain that timely notice was given.

## III.

The insurance company should not be held to a lesser standard of care under the insurance contract simply because necessity has driven an insured to seek financing to pay its premiums. There is nothing in Illinois insurance law that absolutely immunizes the insurer from its strict obligations when terminating or canceling a policy for nonpayment of premiums. Accordingly, Universal cannot be relieved of its responsibilities, notwithstanding the agreement between Imperial and the Jabins appointing Imperial as their "Attorney-in-fact with complete authority to cancel the Policies" and the Illinois Premium Finance Act, which gives the finance company the right to "request cancellation in the name of the insured." Ill.Rev.Stat. ch. 73 ¶ 1065.68.

Whatever the effect of the Premium Finance Act on the relationship between the lender and the borrower, this statute cannot operate as a safe haven for insurance companies. Its provisions cannot dilute the high duty of care imposed upon an insurance company when it seeks to terminate the contract of a policy holder.

Whether viewed from "a strict standard" or even couched in terms of ordinary care, I believe that the Illinois courts would hold that Universal had an obligation to do more than rely on the pre-printed statement contained in the finance company's standardized form. Universal had obligations under its contract to notify the Jabins of its intent to cancel their policy, and instead of doing this itself, Universal delegated the task to the finance company, which was not a party to the insurance contract. Universal may delegate a task, but it may not delegate the ultimate responsibility of giving notice, for such abdication flies in the face of the public policy considerations upon which the Illinois insurance code is based.

## IV.

Universal relied on Imperial's representation that notice of termination had in fact been made by Imperial to the policy holder. This reliance was misplaced. There is no proof that the insured ever received actual and timely notice of the intent to cancel. Indeed, there is no proof that Imperial placed the notice in the U.S. mails. All we have is a form affidavit from an Imperial representative, Willie Davis, with check marks indicating that he delivered the notice in a stamped envelope to a private presort service. This is insufficient to trigger the presumption of receipt under Illinois case law.

To establish that proper notice was received by an insured, the insurance company or its agent, in this case, the premium finance company, must show that the notice was delivered to the U.S. mails and that such delivery was timely. Universal did not provide sufficient evidence that Imperial fulfilled either obligation.

## A.

A correspondence is presumed to have been received "when the correspondence has been placed in a properly addressed envelope with adequate postage affixed and deposited in the mail." *First Nat'l Bank of Antioch v. Guerra Constr. Co., Inc.*, 153 Ill.App.3d 662, 667, 106 Ill.Dec. 582, 505 N.E.2d 1373 (1987). In *Buckingham Corp. v. Ewing Liquors Co.*, 15 Ill.App.3d 839, 842, 305 N.E.2d 278 (1973), the Illinois Court of Appeals held that the presumption did not apply when the sole testimony regarding mailing was that the company used a mailing service for all mass mailings and no witness was familiar with the practices of the mailing service.

The teachings of *Buckingham* control this case. Here, as in *Buckingham*, there was testimony only that the notices were delivered to a presort service. There was no testimony, by affidavits or otherwise, disclosing what took place at the pre-sort agency after the notice was delivered to them or when mailing of the notice actually occurred. Similarly, there was no description of practices generally followed by the presort service. Although "direct testimony from the person who actually performed the mailing is not necessary if corroborating circumstances are otherwise sufficient," *First Nat'l Bank*, 153 Ill.App.3d at 668, 106 Ill.Dec. 582, 505 N.E.2d 1373, no such corroborating evidence was forthcoming in this case. No evidence was provided by Universal or Imperial to substantiate the contention that the notices were in fact mailed to the insured. Absent the presumption of receipt when an item is placed in the U.S. mails, Imperial must submit additional proof that the Jabins actually received the notice of cancellation.

Thus, whether we proceed under Illinois general insurance law or, alternatively, under the Premium Finance Act, as argued by the parties and accepted by the majority, the teachings of *Buckingham* mandate that the mere forwarding of notice to a presort service, without more, is insufficient to invoke the presumption of receipt by the addressee under Illinois law. Therefore, Universal's reliance on the affidavits provided by Imperial would have been insufficient to satisfy Illinois' strict standard.

## B.

But there is another fatal flaw in Universal's case. Imperial not only had to prove that the notice was received, but also that receipt was timely under the statute. Under Illinois law, a presumption of timely receipt of a notice arises upon proof that the letter was properly addressed and properly mailed. *See M.S. Kaplan Co. v. Cullerton*, 49 Ill. App.3d 374, 384, 7 Ill.Dec. 220, 364 N.E.2d 381 (1977). This presumption does not apply without some evidence that the notice was actually mailed on the date required. *Id.* Universal received the notice of intent to cancel from Imperial on January 2, and the Jabins' policy was canceled on January 3. The Illinois Premium Finance Act requires that the finance company provide "[n]ot less than 10 days written notice" to the insured of an intent to cancel. Ill.Rev.Stats. ch. 73 ¶ 1065.68.

Imperial provided only an affidavit from Willie Davis that the notice of intent to cancel addressed to the Jabins was "delivered to United Presort Service" on December 18, 1989, ten days prior to the notice of cancellation and that the cancellation notice was delivered to the presort service on December 29, 1989. App. at 19–20. There was no evidence that the notices were actually placed in the U.S. mails on or around the dates provided sufficient to satisfy the statute's ten day requirement. This omission is fatal to Imperial's attempt to prove timely constructive receipt by the Jabins.

Accordingly, there was insufficient proof that the notice was delivered to the U.S. mails or that the Jabins received timely notice under the Finance Act, if in fact they received any notice at all.

## V.

I am satisfied that the Illinois courts would hold that Universal's misplaced reliance on Imperial's representations constituted an impermissible deviation from the strict standard imposed on insurers under Illinois insurance law.

I would reverse the grant of summary judgment in favor of Universal. Accordingly, I dissent.