**In re KMART CORPORATION, et al., Debtors.**

**No. 02 B 2474.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Sept. 25, 2002.

John Wm. Butler, Jr., J. Eric Ivester, Mark A. McDermott, Skadden, Arps, Slate, Meagher & Flom, Chicago, IL, for Kmart, et al.

Terri M. Long, Law Offices of Terri M. Long, Homewood, IL, for San Diego Mart Associates.

David A. Newby, McCarthy, Duffy, Neidhart & Snakard, Chicago, IL, for Moulton, Inc.

Matthew E. Wilkins, Butzel Long, P.C., Detroit, MI, for WIENM Properties, Inc.

### *ORAL RULING*

SUSAN PIERSON SONDERBY,
Bankruptcy Judge.

The motions of San Diego Mart Associates for an order compelling immediate performance of ceratin non-residential lease obligations and for other relief with respect to Kmart Store No. 4359 and Kmart Store No 4306, the motion of Moulton Properties, Inc. to compel performance of lease obligations, and motion of WIENM Properties to compel payment of

post-petition obligations or for other relief are being disposed of in this oral ruling.[1]

Kmart Corporation and 37 of its affiliates filed voluntary petitions for reorganization under chapter 11 of the Bankruptcy Code on January 22, 2002, which the Court will refer to as the Petition Date. Kmart reports that as of the Petition Date, it operated in over 2,100 stores across the United States, Puerto Rico, U.S. Virgin Islands and Guam.

San Diego Mart Associates leases two stores to Kmart, one located in El Cajon, California, which is referred to as Store No. 4359 and the other in Chula Vista, California, which is Store No. 4306. Moulton Properties, Inc. leases a store located in Pennsacola, Florida to Kmart, which is referred to as Store No. 9714. WIENM Properties leases stores located in Waukesha, Wisconsin (Store No. 4376), Greenfield, Wisconsin (Store No. 4385), Wauwatosa, Wisconsin (Store No. 4380) and Bridgeview, Illinois (Store No. 4381) to Kmart.

San Diego Mart filed two separate motions relating to its two leases. In both motions, San Diego Mart requests, among other relief, the entry of an order compelling Kmart to reject the leases or shortening the time for Kmart to assume or reject the leases. The Court denied the requests to compel a rejection of the leases and to shorten the time for Kmart to assume or reject the leases for the reasons given at the initial hearing on San Diego Mart's motions.

San Diego Mart also requests entry of an order compelling Kmart to immediately perform lease obligations relating to the payment of percentage rent. Under both of the San Diego Mart leases, in addition to a minimum base rent, "with respect to any lease year during a lease term in which [Kmart's] 'gross sales' ... shall exceed the sum of $10,395,000 [Kmart] shall pay to [San Diego Mart] as additional rental an amount which shall be: One percent of gross sales exceeding $10,395,000." This additional percentage rent is payable on or before the 21st day following the end of the lease year. Under the El Cajon lease, the lease year runs from April 1 through March 31, so the percentage rent payment is due April 21. Under the Chula Vista lease, the lease year runs from November 1 through October 31, so the percentage rent payment is due November 21.

In connection with the percentage rent obligation, the San Diego lease requires Kmart to deliver on the 21st day following the end of each lease year or a lesser period, as defined in the lease, "a statement signed by an officer of [Kmart] certifying the true amount of gross sales for such lease year or lesser period." The leases also give San Diego Mart, or its agent, the right to inspect Kmart's records of gross sales, annually, "provided such inspection shall be made at Kmart's principal office within six months after the statement of sales shall be delivered and shall be limited to the period covered by such statement ... "

The subject lease year for the El Cajon store ended March 31, 2002, so the percentage rent payment was due April 21, 2002. The subject lease year for the Chula Vista lease does not end until October 31, 2002. Since the lease year has not expired yet, whether to compel the payment of percentage rent for that lease year is not ripe for adjudication. Accordingly, the request for percentage rent in the motion relating to Chula Vista is denied without prejudice.

As for the El Cajon lease, Kmart submitted its gross sales statement on April

---

1. Read into the record on September 25, 2002. Edited for print publication.

30, 2002. Kmart reported that based on its gross sales, percentage rent for the lease year totaled $59,436.49. From this amount, Kmart deducted $8,281.87 in sewer charges. Kmart then prorated the remaining amount over the twelve months of the lease year to arrive at the amount of percentage rent attributable to the postpetition period; that is, $9,231.95. This amount was paid to San Diego Mart.

■ San Diego Mart has a number of issues with respect to the percentage rent obligation. To begin with, the statement of gross sales was not certified by a Kmart officer as required by the lease. San Diego Mart asks this Court to enter an order compelling Kmart to immediately provide officer certified percentage rent statements for all years in which a certified report does not exist. Kmart argues in its papers that San Diego Mart waived its right to insist upon an officer certified statement because Kmart never provided officer certified statements for the three decades the lease has been in effect. San Diego Mart does not contest this.

Neither party suggests which law ought to apply to this issue so the forum state's law applies by default. *ECHO, Inc. v. Whitson Co. Inc.*, 52 F.3d 702, 707 (7th Cir.1995). The lease provides for California law to govern. Under either state law, the result is the same. Thirty years of accepting statements without verifying the proper certification or complaining of the adequacy of the certification is conduct so inconsistent with an intent to insist upon officer certified statements it induces a reasonable belief that the requirement of officer certified statements was waived. *See Kane v. American Nat. Bank & Trust Co.*, 21 Ill.App.3d 1046, 316 N.E.2d 177 (2d Dist.1974) (Illinois law) and *Rheem Mfg. Co. v. United States*, 57 Cal.2d 621, 21 Cal.Rptr. 802, 805, 371 P.2d 578 (1962) (California law). Accordingly, San Diego

Mart waived the requirement of officer certified statements. The Court makes no decision at this point as to whether the waiver applies on a going-forward basis.

San Diego Mart contends that Kmart has not responded to its request to inspect the gross sales records. San Diego Mart requests that the Court enter an order allowing it to inspect Kmart's records of gross sales for the past ten years. Kmart has agreed to provide access to its records with respect to the El Cajon store for the last lease year. As stated earlier, the terms of the lease requires San Diego Mart to inspect within six months of the delivery of the statement of gross sales. The Court will not expand the inspection rights beyond what the lease requires or what Kmart agrees to do. Therefore, the request to inspect gross sales records is allowed, but only with respect to the last lease year.

San Diego Mart concedes that Kmart is entitled to deduct sewer charges, but San Diego Mart contends that Kmart should not have deducted the sewer charges attributable to the prepetition period from the postpetition percentage rent.

■ Finally, San Diego Mart contends that Kmart should not have prorated the percentage rent over the entire lease year to arrive at the portion of the percentage rent attributable to the postpetition period. San Diego Mart asserts that the entire amount of the percentage rent is due postpetition because Kmart's obligation to pay the same arose 21 days after the lease year expired, a date which occurred approximately three months after the Petition Date.

San Diego Mart alternatively argues that if the percentage rent is viewed as accruing at an earlier date than the due date, then the percentage rent began to accrue when Kmart achieved the requisite

348

level of sales referred to as the breakpoint. Neither San Diego Mart nor Kmart advised when Kmart reached the breakpoint as to the El Cajon lease.

Now, as to Moulton. Moulton has only one request in its motion. Moulton seeks the entry of an order compelling Kmart to perform the obligations under the lease relating to percentage rent. Moulton's lease runs from June 1 to May 31. Under the Moulton lease, Kmart is required to pay one percent of its gross sales exceeding $6,562,500, up to $10,500,000, plus one-half of one percent of gross annual sales exceeding $10,500,000, up to $13,125,000. The percentage rent is to be paid on or before the thirtieth day following the end of each lease year based upon Kmart's report of its sales for that year.

The subject lease year for Moulton ended May 31, 2002. On July 1, 2002, Moulton received a statement from Kmart signed by a Kmart officer certifying that the amount of gross sales for the lease year ending May 31, 2002 was $11,498,254.31.

Kmart then calculated the amount of percentage rent based upon the gross sales. The resulting amount was then prorated over the twelve months of the lease year to arrive at the amount of percentage rent attributable to the postpetition period, that is, $15,801.69, which was paid to Moulton.

Moulton contends that the split of percentage rent between pre and postpetition periods is inappropriate given the terms of the lease. Moulton argues Kmart's obligation to pay the percentage rent arose upon the satisfaction of three conditions: (1) the expiration of the lease year; (2) the achievement of the breakpoint; and (3) Kmart's delivery of its report of gross sales. Although Moulton does not indicate when it thinks the breakpoint was achieved, the expiration of the lease year

and the delivery of the sales report occurred postpetition. Therefore, according to Moulton, the entirety of the percentage rent is a postpetition obligation of Kmart.

Moulton asserts that the lease must be read to mean that the percentage rent payment called for thereunder is, in fact, payable in advance. Consequently, the May 30, 2002 percentage rent payment is actually for the next lease year. The May 30, 2002 percentage rent payment is merely calculated based upon the sales numbers from the previous lease year.

The Court believes that Moulton's characterization of the obligation is contrary to the terms of the lease. Under the Moulton lease, the obligation to pay the percentage rent relates to the year in which the breakpoint is met. This conclusion is supported by the language in the lease at paragraph 4 as to how to calculate the percentage rent for the first lease year— "Sales for any period preceding the first lease year shall be included in gross sales reported for the first lease year."

WIENM Properties filed one motion relating to all of its four leases. In its motion, WIENM requested the entry of an order compelling Kmart to assume or reject the leases, or in the alternative, for modification of the automatic stay. For the reasons stated at the initial hearing on WIENM's motion, these two requests were denied. In its motion, WIENM also requested the entry of an order compelling Kmart to immediately perform the percentage rent obligations under the lease relating to store no. 4376 in Waukesha, Wisconsin. WIENM contends that percentage rent totaling $12,129.08 was due and payable by Kmart at the end of the lease year on February 21, 2002, a date after the petition date.

All three of the movants rely on section 365(d)(3) of the Code which provides, in

part, that the trustee [or debtor in possession], "shall timely perform all obligations of the debtor ... arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected." 11 U.S.C § 365(d)(3). There is no dispute that Kmart owes percentage rent under the subject leases, which have not yet been rejected. The issue is how much of the percentage rent is an obligation that "arose from and after" the petition date and is therefore payable to the landlord under section 365(d)(3).

There are three possible approaches that can be employed to determine whether a percentage rent obligation arose after the petition date for purpose of section 365(d)(3). These approaches are commonly referred to as the Billing Date Approach, the Accrual Approach and the Breakpoint Approach. The Accrual Approach has two subsets which address the issue of percentage rent. These two subsets of the Accrual Approach differ in the method of calculation. The calculation can be based on a calendar method of accrual or a sales volume method of accrual.

Courts using the Billing Date Approach construe the language of section 365(d)(3) to require debtors to pay lease obligations without proration if they become due under the terms of the subject lease during the postpetition period. *See In re Montgomery Ward Holding Corp.*, 268 F.3d 205 (3rd Cir.2001). The *Montgomery Ward* case dealt with real estate taxes. There appears to be no published opinions where a court used the Billing Date Approach with respect to percentage rent. If the approach were used, percentage rent would be considered an entirely postpetition obligation if the date when the debtor has to make the percentage rent payment to the landlord under the lease occurs on any date after the filing of the petition.

The Court agrees with the Seventh Circuit's assessment that the billing date approach ignores the rehabilitative purposes of the Code and creates an inconsistency with the priority and distribution schemes of the Code. *See In re Handy Andy Home Improvement Centers, Inc.*, 144 F.3d 1125 (7th Cir.1998), *see also* John C. Murray, *Percentage Rent Provisions in Shopping Center Leases: A Changing World?* 35 REAL PROPERTY, PROBATE AND TRUST JOURNAL 731 (Winter 2001). Therefore, the Court will not adopt the billing date approach for percentage rent.

Under the Accrual Approach, courts prorate the obligation regardless of the happenstance of the billing date. *See Handy Andy*, 144 F.3d at 1127. Using this approach, the percentage rent is divided between prepetition and postpetition portions. To determine what portion of the percentage rent arose postpetition, one multiplies the total amount of percentage rent due (as if there were no bankruptcy) by a fraction, the numerator of which is the total number of postpetition days and the denominator of which is the total days in the lease year. This is the method that Kmart urges to be employed here.

Under the sales volume method of accrual, to determine what portion of the percentage rent arose postpetition, one multiplies the total amount of percentage rent due by a fraction, the numerator of which is the total amount of postpetition sales and the denominator of which is the aggregate annual sales. This method was employed by the bankruptcy court in the Petrie Retail, Inc. case, but was rejected on appeal to the district court. *See In re Petrie Retail, Inc.*, 233 B.R. 256 (S.D.N.Y. 1999).

The Breakpoint Approach was developed to address the peculiarities of percentage rent. Under the Breakpoint Approach, the percentage rent is not viewed

as accruing over the lease year. Whether the percentage rent is owing at all is contingent on the debtor reaching a certain level of sales. Once the level is met, the contingency is satisfied and the obligation comes into being, or in other words, arises. Under the Breakpoint Approach,

> [I]f the breakpoint was exceeded after the bankruptcy filing, the percentage rent would be calculated as a percentage only of sales made postpetition and the entire amount of the percentage rent would be characterized as a postpetition obligation of the tenant.... [I]f the sales breakpoint had been exceeded prepetition, only the share of percentage rent arising from postpetition sales would be a postpetition obligation of the tenant.

Murray, *supra* at 784. The Breakpoint Approach was adopted in *In re Revco D.S., Inc.*, 111 B.R. 626 (Bankr.N.D.Ohio 1989) and *Petrie Retail*, 233 B.R. 256.

The district court in *Petrie Retail* distinguished *Handy Andy* on the basis of a comparison of the nature of a real estate tax obligation and a percentage rent obligation—

> ... a tenant's obligation under a lease to pay real property taxes assessed on the leased premises is readily distinguishable from the payment of percentage rent. Unlike percentage rent, the tenant's obligation to pay taxes ordinarily will not be contingent upon an uncertain future event, such as meeting a sales breakpoint. Rather, both the obligation to pay taxes and the amount of those taxes will usually be certain from the first day of the lease year, so that the tenant's obligation to pay these taxes can be said to have arisen incrementally over each day of the lease year. Proration of such fixed obligations by the calendar method respects the text of the statute by allocating the tenant's obli-

gation between the pre-petition and post-petition periods based upon a reasonable determination of the date on which the obligation arose. There is, however, no such logical basis for proration of contingent obligations such as percentage rent, which can be said to arise only when the tenant exceeds the breakpoint and its obligation to pay percentage rent becomes certain.

*Petrie Retail*, 233 B.R. at 260 (citations omitted).

This Court agrees with the *Petrie Retail* court's assessment. The Seventh Circuit states in *Handy Andy*,

> The quarrel between the parties is over whether Handy Andy's "obligation" under the lease could arise before Handy Andy [the tenant] was contractually obligated to reimburse National [the landlord] for the taxes that the latter had paid. National says no, and this "billing date" approach is a possible reading of section 365(d)(3), but it is neither inevitable nor sensible. It is true that Handy Andy's obligation to National to pay (reimburse National for paying) the real estate taxes did not crystallize until the rental due date after the taxes were paid. But since death and taxes are inevitable and Handy Andy's obligation under the lease to pay the taxes was clear, that obligation could realistically be said to have arisen piecemeal every day of 1994 and to have become fixed irrevocably when, the last day of the year having come and gone, the lease was still in force.

*Handy Andy* 144 F.3d at 1127.

It is clear that the Seventh Circuit relied upon the decidedly non-contingent nature of the real estate tax obligation to arrive at the conclusion that the tax was accruing piecemeal every day throughout the year. It is therefore incumbent upon this Court to examine the inevitability of the obli-

gation to determine when it arises for purposes of section 365(d)(3).

The Seventh Circuit's use of the familiar maxim concerning "death and taxes" should not be discounted. Whether a retailer achieves a certain negotiated sales level during a lease year is hardly in the same league as death and taxes. In addition, unlike taxes, the tenant has some input during lease negotiations as to when and how the percentage rent obligation starts to accrue.

Kmart urges the Court to consider the nature of percentage rent. Percentage rent is after all rent and rent is given as consideration for a tenant's use and occupancy of the demised premises for the entire lease year. Kmart also points out that to start the calculation at the breakpoint ignores all of the sales that enabled Kmart to reach that breakpoint. Both points are well taken. As a general proposition, percentage rent "provide[s] an opportunity for the landlord to share in the future economic success of the tenant's business, often in exchange for a lower base fixed minimum rent." Murray, *supra* at 732. So, the landlord and tenant in a sense can be said to share in the potential rewards and business risks of the retailer's business. This sharing occurs throughout the lease year.

The Court also recognizes the risk of an apparent windfall to the landlord if the Breakpoint Approach is used. To explain, if the breakpoint is reached close to or shortly after the petition date, followed closely by a holiday season, the lion's share of the sales upon which percentage rent is calculated would occur postpetition and, therefore, benefit the landlord.

On the other hand, the language of 365(d)(3) is couched in terms of arising. The obligation to pay percentage rent does not spring into being, or begin to arise until the breakpoint is reached. Moreover, as stated before, the Seventh Circuit relied on the inevitability of the real estate tax obligation in arriving at its decision. Inevitability is not present here given the inclusion of a breakpoint in the percentage rent provision of the leases.

Accordingly, the Court grants the motions of San Diego Mart, Moulton and WIENM compelling Kmart to perform the postpetition obligations and holds that the proper approach for determining whether percentage rent arose postpetition is the Breakpoint Approach. If the breakpoint under a lease is exceeded after the petition date, all percentage rent owing under the lease is recoverable under section 365(d)(3). If the breakpoint is exceeded prior to the petition date and the lease year ends after the petition date, only the percentage rent from sales subsequent to the petition date is recoverable under section 365(d)(3).

In the Moulton lease there were two breakpoints (one percent of gross sales exceeding $6,562,500 up to $10,500,000 and one-half of one percent of gross sales exceeding $10,500,000 up to $13,125,000). In the case of multiple breakpoints like this, if both breakpoints are achieved after the petition date, all percentage rent owing under the lease is recoverable under section 365(d)(3). If one breakpoint is achieved prepetition and the other postpetition, only the percentage rent from sales subsequent to the petition date is recoverable under section 365(d)(3), the calculation would differ in accordance with when the second breakpoint is achieved.

Kmart contends that it is mathematically impossible to calculate when the gross sales hit the breakpoint because Kmart cannot apportion the adjustments that it is authorized to make to gross sales, such as returned merchandise, employee discounts, and certain taxes. Kmart asserts that the

352

reason the *Revco* court decided the break-point approach was appropriate was because the debtor in that case could determine when it achieved the required level of gross sales. The Court does not read *Revco* that way. The statement in the *Revco* decision that the debtor had the ability to calculate gross sales was not made in such a way to indicate that the court in that case specifically relied upon that ability or examined any arguments to the contrary. *See Revco*, 111 B.R. at 626. Kmart has not convinced this Court that it cannot make such a calculation.

In conclusion, this ruling disposes of all matters with respect to the motions of San Diego Mart, Moulton and WIENM Properties.